In Re: ADOPTION of T.B.B., Jr.

Appeal of: K.N., Natural Mother.

In Re: Adoption of B.M.B.

Superior Court of Pennsylvania.

Argued Sept. 16, 2003.
Filed Oct. 23, 2003.

Dennis J. Gounley, Greensburg, for appellant.

Dorean N. Petonic, Scottdale, for T.B.B. and B.M.B., appellees.

Charles F. Wade, Greensburg, for Westmoreland County Children's Bureau, appellee.

Before: LALLY–GREEN, TODD, and TAMILIA, JJ.

LALLY–GREEN, J.

¶ 1 Appellant, K.N., ("Mother"), appeals from the order of the Orphans' Court of the Court of Common Pleas of Westmoreland County terminating parental rights to her minor sons, T.B.B., Jr. and B.M.B. We affirm.

¶ 2 The trial court found the following facts:

1. The Petitioner, Westmoreland County Children's Bureau ("WCCB") is an approved agency under the adop-

tion laws of the Commonwealth of Pennsylvania with its main office in Greensburg, Westmoreland County, Pennsylvania.

2. K.N., Respondent, is the natural mother of the above-captioned minor children.

3. The minor child, T.B.B., Jr., is almost 11 years old, having been born on March 11, 1992.

4. The minor child, B.M.B., is almost 10 years old, having been born on May 27, 1993.

5. The parental rights of the natural father, T.B.B., as to both minor children were terminated by the Honorable Charles E. Marker, pursuant to an Order of Court entered on July 18, 2001.

6. The Petitioner assumed custody of the minor children on October 14, 1998.

7. The Reason Custody Was Assumed Was That Allegations Had Been Made That Inappropriate Forms Of Discipline Had Been Occurring. The Respondent Had Allegedly Been Limiting Bathroom Time, Had Been Providing Limited Food, Had Been Locking On[E] Of The Children In A Closet For Extended Periods Of Time, Had Been Restraining The Children, And Had Been Forcing Them To Eat Fecal Matter.

8. Following an adjudication hearing held on February 9, 1999, the children were thereafter adjudicated to be dependent pursuant to an Order of Court entered by the Honorable Charles E. Marker on February 11, 1999.

9. Pursuant to this Order of Court, the Respondent was directed to attend parenting classes, to obtain a psychiatric evaluation, to attend co-joint family counseling, that she receive individual counseling until successful discharge, and that she attend a parent support group until successfully discharged. She was to have no contact with the minor children until recommended by their therapist.

10. Petitioner facilitated the implementation of services including, individual counseling, parenting instruction and psychiatric evaluations.

11. Following a psychiatric evaluation of both boys by Dr. Jerome Fialkov, T.B.B., Jr. was diagnosed with Dysthymiac Disorder (similar to bipolar disorder), and Attention Deficit Hyperactivity Disorder. B.M.B. was diagnosed with identical disorders.

12. Carol Patterson performed psychological evaluations on the parents, their paramours, and the minor children. When she first saw the children in October of 1998, T.B.B., Jr. was having the most difficulty. He was agitated, anxious and depressed. She characterized his behavior as out of control. She described B.M.B. as "overly compliant."

13. Ms. Patterson commenced individual therapy with the minor children in January 1999. At that time, B.M.B.'s behavior had done a "180 degree turn." According to Ms. Patterson, B.M.B. had now assumed behaviors of his mother, and was treating T.B.B., Jr. poorly. The boys were experiencing agitation, anxiety, depression, out-of-control behaviors, poor performance in school, and the inability to socialize with their peers and to do well in family situations.

14. Between January 1999 and April 1999, Ms. Patterson worked with the boys relative to the trauma

they had experienced. The boys did not have any visits with their mother because they were unstable in their foster home. This Instability manifested itself through their inability to respond to rules and discipline, poor performance in school, appetite and sleep disturbance and anxiety. Ms. Patterson attributed this instability to the abuse the boys had sustained.

15. As a result of this instability, in April 1999, the boys were separated. B.M.B. had threatened to kill himself and was placed at the Discovery Unit at Monsour Hospital, the first of two visits to this facility. Upon discharge, he was placed in his current foster home. T.B.B., Jr. was placed in a different foster home.

16. In April 1999, the idea of having an apology session between Mother and the boys was considered. This would precede any reunification of Mother and the boys. However, when the boys were counseled concerning the apology session, their condition deteriorated to such a degree at the thought of any contact with Mother, that the sessions were postponed for several months.

17. By November 1999, the Westmoreland County District Attorney's office had determined to pursue criminal charges against Mother. The focus of Ms. Patterson's work shifted from counseling to preparation for testifying.

18. As a result of the district attorney's interviews to prepare for trial, the condition of the boys again started to deteriorate.

19. Mother subsequently pled guilty to recklessly engaging in conduct, which placed the children in danger of death or serious bodily injury, and to unlawfully restraining the children.

20. Mother was sentenced to intensive probation, including electric home monitoring, to attendance at parenting classes, mental health counseling, and not to have any contact with the children unless permitted by court order.

21. During this same period of time, Carol Patterson also worked with Mother in order to facilitate the apology session. In essence, they put together a script of what Mother would say to the children.

22. In February 2000, after a multidisciplinary team meeting, the members of which included Ms. Patterson, the Petitioner's caseworker, the Guardian Ad Litem appointed for the boys, the workers from the Wrap-Around program, and the foster care home workers, it was concluded that the boys were stable enough such that the apology sessions could take place.

23. T.B.B., Jr.'s apology session was completed in May 2000. B.M.B.'s was completed in June of 2000. The boys requested that each of their foster mothers attend the apology sessions, which they did.

24. Ms. Patterson encouraged the boys to let Mother know how they were feeling as the apology session was taking place, but neither boy elected to do so. T. thought his mother was sad and did not want to upset her further. B.M.B., on the other hand, had nothing to say to her. T.B.B., Jr. did indicate to his foster mother that he wanted to see his mother.

25. Although the Respondent attempted to follow the script that she and

Ms. Patterson had prepared, there was one area of conflict as far as the boys and Carol Patterson were concerned. Mother apologized, not for requiring the boys to eat fecal matter, but for forcing them to eat what she described as beef paste, which she permitted them to believe was feces.

26. It took B.M.B. approximately six months to respond to this conflict. In January 2001 he contacted Ms. Patterson by telephone to let her know that he had remembered something. According to B.M.B., he had had a memory of the incident where his brother T.B.B., Jr. was in the bathtub, and that Mother had forced him to eat "poop." He thereafter wrote his mother a note in which he indicated he knew she was lying and called her an "asshole" and a "dickhead."

27. Following the apology session, the boys' behavior dramatically deteriorated for the third time. According to Ms. Patterson, they exhibited oppositional behaviors. T.B.B., Jr. started to run away from home. He would run into the street and put himself in dangerous situations. Neither boy would follow the rules that had been established for them at foster homes. They were unable to function in school and their grades fell. They became aggressive with their friends and functioned poorly at home.

28. After the apology session, Ms. Patterson continued to work with B.M.B. However, T.B.B., Jr.'s case was transferred to a male therapist, because Ms. Patterson thought he would respond better to a male therapist as opposed to a female therapist.

29. According to Ms. Patterson, T.B.B., Jr. and B.M.B. are two of the most traumatized children she has seen in her 26 years of practice of working with troubled children. She attributes this belief to the fact that the children have become attached to the trauma that was inflicted upon them. They continue to have post-traumatic symptoms. The trauma experienced by the boys has been so severe that it cannot be remedied.

30. Ms. Patterson opined that there is no bond between Mother and the minor children, and that she has no place of importance in their lives. According to Ms. Patterson, it is in their best interests that Mother's rights be terminated so that they can move on with their lives and be adopted by their current foster families.

31. In August 2001, T.B.B., Jr. was placed in the home of his paternal grandparents. Both T.B.B., Jr.'s paternal grandparents and B.M.B.'s foster parents plan on adopting these children if Respondent's parental rights are terminated.

32. T.B.B., Jr.'s current therapist is Greg Faulk of Total family Services. He has seen T.B.B., Jr. on a regular basis since November 2000, and his condition has improved. Just recently, T.B.B., Jr. sees him on only an as-needed basis.

33. While T.B.B., Jr. initially wanted to know why his mother was crying at the apology session, he thereafter advised Mr. Faulk that he did not want to talk to his mother, and never wanted to see her again.

34. According to Mr. Faulk, there is no bond between T.B.B., Jr. and his

mother; she has no place of importance in his life; and it would be in his best interest if her parental rights were terminated.

35. According to the Petitioner's caseworker, B.M.B. is very much at home with his foster family. He addresses his foster mother as "mom". He considers himself as part of that family. T.B.B., Jr. is also doing very well. He's relaxed and happy in his grandparents' home.

36. According to the caseworker who has been assigned to these cases since June of 1999, the boys have no type of relationship with their mother; there is no type of mother/child bond between them; Mother plays no place of importance in their lives, and it will be in the best interests of the children if Mother's rights are terminated.

37. Mother, who had physical custody of the minor children after her separation from Father, indicated that her problems with the boys commenced when they were at very young ages. She described T.B.B., Jr. as "very active", and had difficulty controlling him. T.B.B., Jr. was eventually diagnosed with Attention Deficit Hyperactivity Disorder by their family physician.

38. She also had some problems with B.M.B., but characterized him as more controllable.

39. In the fall of 1998, T.B.B., Jr. started the first grade and B.M.B. was in kindergarten. At this time, Mother indicated that T.B.B., Jr. again became uncontrollable. She was having problems with both boys, in particular, with their soiling themselves.

40. Mother admitted to restraining T.B.B., Jr. on one occasion because he was throwing a tantrum—throwing fists, punching and kicking. She used black electrical tape to restrain him.

41. Mother related that there were occasions when, after sending T.B.B., Jr. to his room, he would climb out of a window and go out on the roof. In order to control him, she would put him in a closet near the basement and hold the door shut. According to Mother, because there was another exit from the closet, she didn't believe he was being restrained.

42. In order to control the boys from urinating in their pants, Mother would monitor and control their fluid intake.

43. Mother's justifications for these extreme disciplinary acts were not credible.

44. Mother has successfully completed parenting classes.

45. Mother has obtained individual counseling, either from a religion-based organization or through Westmoreland Hospital. She has also attended group counseling and counseling at Catholic Charities.

46. According to Mother, she has never refused to do anything requested by the Petitioner and has made progress with her parenting deficiencies. The Petitioner's caseworker confirmed this.

47. The expert witness, Carol Patterson, agrees with this to a point, but believes that Mother, by insisting to the boys that the feces was actually beef paste, has not been totally honest with them.

48. Mother has not seen the children since the apology sessions over two and one-half years ago.

49. Despite Mother's efforts at remedying the circumstances that led to the removal of her children, the Court finds that because of the extreme trauma suffered by her children, it is not likely that she will be able to do so in the near future.

50. There have been no appeals to the findings of fact and recommendations made and filed of record at 69 WCCB 1998.

51. There are no other services available to be offered to the Respondent by the Petitioner.

52. On June 24, 2002, this Court denied Mother's motion to permit an independent evaluation of the minor children and Mother.

53. This Court noted in its Order that Mother had presented a similar motion to Judge Rita D. Hathaway in April 2001 under the Petitioner's case at 69 WCCB 1998, which had also been denied. There had been a finding in the earlier Order that such an evaluation of the minor children would be harmful to their well being.

54. This Court found that on June 24, 2002, such an evaluation would harmful to these children.

55. In an effort to balance the best interest of the minor children and the right of birth mother, because of the June 24, 2002 denial, the Court permitted the Respondent's expert to conduct a records review. However, the Respondent's expert was ultimately permitted only to testify as to Mother's efforts at correcting her parenting deficiencies since the children were taken into custody.

56. Because the minor children have been in placement for over the past four years, they have little, if any, bond with the Respondent.

57. The minor children will suffer little, if any, emotional trauma if the parental rights of the Respondent are terminated. In fact, the opposite is true. The Court finds that not terminating Mother's parental rights would actually be more traumatic to the minor children.

58. It would be in the best interest of T.B.B., Jr. and B.M.B. if the Respondent's parental rights were terminated, thus making adoption possible by the boys' foster families.

59. The needs and welfare of these minor children will be met if the Respondent's parental rights are terminated.

Trial Court Opinion, 1/27/03, at 1–9 (citations omitted). Based on these findings, on January 27, 2003, the court terminated Mother's parental rights. This appeal followed.

¶ 3 Mother raises four issues on appeal:

1. Whether the lower court abused its discretion and/or committed an error of law in finding that the county agency met its burden of proof by clear and convincing evidence of the statutory grounds for terminating the parental rights of the natural mother.

2. Whether the lower court abused its discretion and/or committed an error of law in denying the petition of the natural mother for an independent psychological evaluation of the two minor children.

3. Whether the lower court abused its discretion and/or committed an error of law in finding that it was in the best interest of the children that the mother's parental rights be terminated.

4. Whether the lower court abused its discretion and/or committed an error of law in severely restricting the testimony of mother's expert and in excluding his report.

Mother's Brief at 5. We address issues one and three first for ease of understanding.

¶ 4 Our standard of review in cases involving the termination of parental rights is limited to the determination of whether the orphans' court decree is supported by competent evidence. *In re Julissa O.*, 746 A.2d 1137, 1139 (Pa.Super.2000).

In appeals involving termination of parental rights, our scope of review is broad. *In the Interest of Lilley*, 719 A.2d 327, 329 (Pa.Super.1998). We consider all the evidence as well as the hearing court's factual and legal determinations. *Id.* Our standard of review, however, is limited to determining whether the decree of the hearing court is supported by competent evidence and whether the court gave adequate consideration to the effect of such a decree on the welfare of the children. *Adoption of Atencio*, 539 Pa. 161, 650 A.2d 1064 (Pa.1994); *In re Child M.*, 452 Pa.Super. 230, 681 A.2d 793 (Pa.Super.1996), *appeal denied sub nom. Child M. v. Smith*, 546 Pa. 674, 686 A.2d 1307 (Pa.1996). However, if competent evidence supports the court's findings, we will affirm even if the record could also support the opposite result. *Atencio, supra.*

*In re: N.C., N.E.C.*, 763 A.2d 913, 917 (Pa.Super.2000). We recognize that:

in a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by "clear and convincing" evidence the existence of grounds for doing so.

*In the Interest of: L.S.G.*, 767 A.2d 587, 590 (Pa.Super.2001). Where an orphans' court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury's verdict. *In the Interest of C.S.*, 761 A.2d 1197, 1199 (Pa.Super.2000).

¶ 5 Permissible grounds for involuntary termination of parental rights are specified in 23 Pa.C.S.A. § 2511. The Westmoreland County Children's Bureau (WCCB) is to prove grounds for termination under any one of the eight grounds listed in 23 Pa.C.S.A. § 2511.[1] *In the Interest of: L.S.G.*, 767 A.2d at 590.

¶ 6 Mother first claims that, despite the completion of court-ordered services, she cannot remedy the conditions which led to placement because the boys were so traumatized by abuse that any contact with Mother exacerbates the problem. We view Mother's claim as one of whether the trial court erred in finding grounds for involuntary termination of her parental rights under 23 Pa.C.S.A. §§ 2511(a)(5) and (8) ("Section 2511(a)(5)" or "Section 2511(a)(8).") We will address these sections separately.

¶ 7 Section 2511(a)(5) provides:

Grounds for involuntary termination

(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six

---

**1.** Here, the orphans' court concluded that grounds for termination of Mother's parental rights existed pursuant to both 23 Pa.C.S.A. § 2511(a)(5) and (8).

months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

Under Section 2511(a)(5), we, thus, review the record to determine whether T.B.B., Jr. and B.M.B. have been removed from Mother for six months and whether Mother can remedy the conditions leading to the removal of T.B.B., Jr. and B.M.B. *See, In the Interest of Lilley,* 719 A.2d 327, 334 (Pa.Super.1998) (the child has been removed from the parents by the court and the conditions which led to placement of the child continue to exist and have not been remedied within a reasonable time and termination of parental rights would best serve the needs and welfare of the child). We also note that in considering the importance of stability to a child's welfare, the reasons why the child has been with the third party for so long must be taken into account. *In Re: Adoption of Steven S.,* 417 Pa.Super. 247, 612 A.2d 465, 471 (1992), *appeal denied,* 533 Pa. 661, 625 A.2d 1194 (1993).

¶ 8 Our review of the record reflects that WCCB assumed custody of the boys on October 14, 1998. N.T., 7/31/02, at 8; N.T., 10/30/02, at 76. Mother, thus, failed to provide for the boys since that time. While Mother completed parenting classes subsequent to removal of the boys, when Mother did care for the boys before their removal, she admitted to restraining T.B.B., Jr. N.T., 10/30/02, at 64, 76–77. In fact, Mother restrained T.B.B., Jr. with black electrical tape. N.T., 7/31/02, at 24, 81. Mother also admitted putting T.B.B., Jr. in a closet near the basement and holding the door shut. *Id.* at 24, 26. Mother monitored and controlled the boys' fluid and food intake and admitted to not permitting the boys to go to the bathroom except at times scheduled by Mother. *Id.* at 24. Mother used inappropriate forms of discipline such as smearing feces in the boys' faces. *Id.* B.M.B. testified about an incident in the bathtub when Mother made T.B.B., Jr. eat poop. N.T., 7/31/02, at 74. A document dated October 5, 2000 captioned "Commonwealth vs. [K.N.]," indicates that criminal charges were brought against Mother. *Id.* at 7. Mother pled guilty to recklessly engaging in conduct which placed the children in danger of death or serious bodily injury and to unlawfully restraining the children. *Id.* at 25–26.

¶ 9 WCCB caseworker, Ms. Carol Patterson, testified that T.B.B., Jr. and B.M.B. are two of the most traumatized children she has seen in her 26 years of working with troubled children and that it would be in the boys' best interests if Mother's rights were terminated. N.T., 7/31/02, at 13, 81–82. Ms. Patterson also testified that the trauma experienced by the boys has been so severe that it cannot be remedied. *Id.* at 82–83. As the above reflects, Mother inflicted the trauma sustained by the boys. N.T., 7/31/02, at 24–25.

¶ 10 In summary, the record reflects that T.B.B., Jr. and B.M.B. have been removed from Mother's care for almost five years, almost four and one-half years longer than required under Section 2511(a)(5). No evidence demonstrates that the conditions which necessitated removal of the boys have been or can be remedied because the prior trauma the boys suffered at the hand of Mother was so severe. The

reason for the extended separation of Mother from the boys is the result of Mother's prior actions. *In Re: Adoption of Steven S.* Mother's claim under Section 2511(a)(5) fails.

¶ 11 Mother next complains that the trial court erred in finding grounds for involuntary termination of her parental rights under Section 2511(a)(8). Mother specifically complains that termination of her parental rights would not serve the boys' best interests.

¶ 12 Section 2511(a)(8) provides:

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

Under Section 2511(a)(8), we, thus, review the record to determine whether T.B.B., Jr. and B.M.B. have been removed from the care of Mother for 12 months and whether the termination of parental rights would best serve the needs and welfare of the boys. *See, In the Interest of: L.S.G.,* 767 A.2d at 591 (the child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child). Termination under Section 2511(a)(8) does not require evaluating Mother's willingness or ability to remedy the conditions that initially caused placement. 23 Pa.C.S.A. § 2511(B); *In Re Adoption of M.E.P.,* 825 A.2d 1266, 1276 (Pa.Super.2003).

¶ 13 Again, our review of the record reflects that Mother has failed to provide for T.B.B., Jr. and B.M.B. since October 14, 1998. N.T., 7/31/02, at 8; N.T., 10/30/02, at 76. Mother acknowledged that she had difficulty controlling T.B.B., Jr. N.T., 10/30/02, at 58–60. Finally, a therapist and a caseworker testified that B.M.B. is very much at home with his foster family, considers himself part of that family and calls his foster mother "mom." N.T., 7/31/02, at 17. T.B.B., Jr. is also doing very well and is relaxed and happy in his current placement with his paternal grandparents. *Id.*

¶ 14 The record also reflects that WCCB caseworker, Ms. Patterson, testified that the boys have no type of relationship with their mother, there is no bond between them and, Mother occupies no place of importance in their lives. N.T., 7/31/02, at 83. Ms. Patterson testified that it would be in the boys' best interests if Mother's rights were terminated. *Id.* Ms. Patterson also testified that Mother has not been totally honest with the boys. *Id.* at 74–75.

¶ 15 In summary, the record reflects that T.B.B., Jr. and B.M.B. have been removed from Mother's care for almost five years, almost four years longer than the 12 months required under Section 2511(8), and that termination of Mother's parental rights would best serve the needs and welfare of T.B.B., Jr. and B.M.B. Mother's claim fails.

¶ 16 Mother next complains, generally, that the orphans' court erred in determining that termination of her parental rights would best meet the developmental, physical and emotional needs and welfare of T.B.B., Jr. and B.M.B. under 23 Pa. C.S.A. § 2511(b). Section 2511(b) provides:

(b) Other considerations.—The court in terminating the rights of a parent shall

give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

¶ 17 The primary consideration in the termination of parental rights are the needs and welfare of the child. 23 Pa.C.S.A. § 2511(b). The court must carefully consider the tangible dimension, as well as the intangible dimension, of the needs and welfare of a child, such as the love, comfort, security, and closeness, all of which are part of a parent-child relationship. *In the Interest of C.S.*, 761 A.2d at 1202. Continuity of relationships is also important to a child. *Id.* In considering what situation would best serve the child's needs and welfare, the court must examine the status of the bond between the natural parent and the child to consider whether terminating the natural parents' rights would destroy an existing, necessary and beneficial relationship. *Id.* (*citing In re P.A.B.*, 391 Pa.Super. 79, 570 A.2d 522, 525–26 (1990)).

¶ 18 Again, our review of the record reveals the following. Mother admitted to restraining T.B.B., Jr. with black tape. N.T., 10/30/02, at 64, 76–77, and 81. Mother also admitted putting T.B.B., Jr. in a closet near the basement and holding the door shut. *Id.* at 24, 26. Mother controlled the boys' fluid and food intake and admitted to not permitting the boys to go to the bathroom except at times scheduled by Mother. *Id.* at 24. Mother used inappropriate forms of discipline such as smearing feces in the boys' faces, and even made T.B.B., Jr. eat poop. N.T., 7/31/02, at 74. Mother pled guilty to recklessly engaging in conduct which placed the children in danger of death or serious bodily injury and to unlawfully restraining the children. *Id.* at 25–26.

¶ 19 Ms. Patterson testified that T.B.B., Jr. and B.M.B. are two of the most traumatized children she has seen in her 26 years of working with troubled children and that it would be in the boys' best interests if Mother's rights were terminated. N.T., 7/31/02, at 13, 81–82. Ms. Patterson also testified that the trauma experienced by the boys has been so severe that it cannot be remedied. *Id.* at 82–83. Also, Ms. Patterson testified that the boys have no type of relationship with their mother, there is no bond between them and Mother occupies no place of importance in their lives. N.T., 7/31/02, at 83.

¶ 20 Further, a therapist and WCCB caseworker testified that B.M.B. is very much at home with his foster family, considers himself part of that family and calls his foster mother "mom." N.T., 7/31/02, at 17. T.B.B., Jr. is also doing very well and is relaxed and happy in his current placement with his paternal grandparents. *Id.*

¶ 21 In summary, the record supports the court's conclusion that T.B.B., Jr. and B.M.B. have developed a familial relationship with their foster parents, that no bond exists between Mother and the boys, and that terminating Mother's rights would best serve the needs and welfare of the boys. Mother cannot now complain about the consequences of the abuse she previously inflicted upon the boys at her own hand. Mother's claim to the contrary lacks merit.

¶ 22 Mother next claims that the court erred when it denied Mother's request for an independent psychological evaluation of the boys because such an evaluation would prove traumatic. Mother asserts that without an independent evaluation, she had nothing on which to base a defense since she had no contact with the children for four years.

¶ 23 As indicated earlier, if competent evidence supports the court's findings, we will affirm even if the record could also support the opposite result. *In re: N.C., N.E.C.,* 763 A.2d at 917. In termination cases, we may reverse only if the court's factual findings are not supported by the record or if the hearing judge applied an incorrect legal standard. *In re Child M.,* 452 Pa.Super. 230, 681 A.2d 793, 800 (1996).

¶ 24 Our review of the record reflects the following. Again, Ms. Patterson testified that T.B.B., Jr. and B.M.B. are two of the most traumatized children she has seen in her 26 years of working with troubled children. N.T., 7/31/02, at 13, 81–82. Ms. Patterson also testified that the trauma experienced by the boys has been so severe that it cannot be remedied. *Id.* at 82–83. Patterson and therapist, Greg Faulk, testified that the mere mention of the abuse endured at the hand of Mother jeopardized the emotional stability of the boys. *Id.* at 78, 82, 153, 155.

¶ 25 In summary, the record reflects sufficient evidence to support the court's determination that the boys would be traumatized by the independent psychological evaluation requested by Mother.[2] The court did not abuse its discretion in denying Mother's request for an independent psychological evaluation. *In re: N.C., N.E.C.; In re Child M.* Mother's claim fails.

¶ 26 Mother finally claims that the court erred in restricting the testimony of her expert, Dr. Nell Rosenblum, and excluding his report. Dr. Rosenblum is a clinical psychologist who reviewed the records from WCCB on behalf of Mother. Dr. Rosenblum wrote a report criticizing WCCB and Ms. Patterson for their handling of the case. Mother argues that Dr. Rosenblum should have been allowed to testify about whether WCCB thwarted the maintenance of the parental relationship. Mother also asserts that Dr. Rosenblum should have been allowed to testify as to the bias of Ms. Patterson in maintaining separation of the boys from Mother. Mother's allegation that the court erred in restricting the testimony of Dr. Rosenblum appears to be Mother's attack of the adequacy of services provided by WCCB and Ms. Patterson.

¶ 27 Regarding the change in placement goals, we have previously stated:

> The decision to allow CYS [Children and Youth Services] to change the service plan goal from reunification to adoption is not merely a minor decision permitting a slight shift in the emphasis of CYS' social services. As a practical and legal matter, an order by the juvenile court changing the child's placement goal from reunification to adoption **ends any dispute that may exist between CYS and the parent as to the adequacy of CYS' services aimed at reuniting the parent with his/her children and,**

---

**2.** The record also reflects that the court gave Mother the opportunity to have a psychologist review all the records in this case, including all evaluations of the children. Further, an evaluation of the records by Mother's independent psychologist did occur. The opportunity afforded by the court gave Mother full access to the records. Mother has not demonstrated how the court's actions impeded her defense.

of course, as to whether CYS had selected the most appropriate goal for this family. By allowing CYS to change its goal to adoption, the trial court has decided that CYS has provided adequate services to the parent but that he/she is nonetheless incapable of caring for the child and that, therefore, adoption is now the favored disposition. In other words, the trial court order is the decision that allows CYS to give up on the parent.

*In the Interest of A.L.D., Jr.*, 797 A.2d 326, 339 (Pa.Super.2002) (*citing In Re In Interest of M.B.*, 388 Pa.Super. 381, 565 A.2d 804, 807–08 (1989), *appeal denied*, 527 Pa. 601, 602, 589 A.2d 692 (1990)) (emphasis in citing authority). Further, in a termination proceeding, the focus of the court is whether child services has satisfactorily borne its statutory burden for termination under Section 2511. *Id.* The focus is not to review the previous juvenile court proceedings or change the service plan goal, because the service plan goal is not the issue before the orphans' court. *Id.* at 339–340.

¶ 28 Our review of the record reflects that the court issued two orders dated April 9, 2002 and August 14, 2002 which changed the placement goal of WCCB from reunification of the boys with Mother to adoption. Mother failed to appeal either the April 9, 2002 or the August 14, 2002 order changing the placement goal. Mother cannot prevent termination of her parental rights by now attacking WCCB's alleged failure to maintain the parental relationship between Mother and the boys. *In the Interest of A.L.D., Jr.* That ship has sailed. Mother's failure to appeal the final orders changing the placement goals renders the issue of the adequacy of services provided by WCCB moot. Mother's final claim fails.

¶ 29 In summary, our review of the record reflects that the decree of the termination court is supported by competent evidence and that the court gave adequate consideration to the effect of such a decree on the needs and welfare of the boys. Accordingly, we affirm the court's termination of Mother's parental rights.

¶ 30 Order affirmed.