J-A07001-21

2021 PA Super 121

| | | |
|---|---|---|
| IN THE INTEREST OF: G.M.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: CLINTON COUNTY CHILDREN AND YOUTH SERVICES | : | |
| | : | No. 1220 MDA 2020 |

Appeal from the Order Entered September 17, 2020
In the Court of Common Pleas of Clinton County Juvenile Division at
No(s): CP-18-DP-0000036-2015

BEFORE:   BOWES, J., DUBOW, J., and STEVENS, P.J.E.[*]

OPINION BY BOWES, J.:                              **FILED: JUNE 14, 2021**

Clinton County Children and Youth Services ("CCCYS" or the "Agency")
appeals from the September 17, 2020 order returning legal and physical
custody of G.M.K. to his maternal uncle, M.K. ("Maternal Uncle"), effective
September 26, 2020, after G.M.K. was discharged by a treatment facility
against medical advice due to violent behavior.  After review, we affirm.

G.M.K. was born in October 2009.  His mother was incarcerated in
Colorado and had not been involved with the family since 2015.  His father is
unknown.  Since he was six months old, G.M.K. has been raised by his
maternal grandmother and Maternal Uncle, either jointly or separately.  The
child was first adjudicated dependent on September 16, 2015, due to his
physical aggression, defiance, and lack of coping skills.  Thereafter, he was

_____

[*] Former Justice specially assigned to the Superior Court.

diagnosed with a litany of conditions including Conduct Disorder, Disinherited Attachment Disorder of Childhood, Attention Deficit Hyperactivity Disorder, Child or Adolescent Antisocial Behavior, Mood Dysregulation Disorder and Autism Spectrum Disorder.  Physicians rated his disability as moderate to severe, prescribed medication, behavioral health services, and therapeutic support staff.

G.M.K. remained in the legal and physical custody of Maternal Uncle, and over the next one and one-half years, the juvenile court conducted regular permanency review hearings.  Maternal Uncle's compliance with the permanency plan ranged between substantial and full.  However, during the summer of 2016, the mental health professionals treating G.M.K placed him at Penn Highlands Dubois Behavioral Health Center for several months.  Legal and physical custody continued to reside with  Maternal Uncle and G.M.K. returned to his care during the winter of 2016.  On June 26, 2017, the juvenile court terminated its supervision of G.M.K..  However, it "directed the Agency to continue to provide and implement services for the family."  Juvenile Court Opinion, 10/7/20, at 5.

Approximately six months later, the Agency filed a second dependency petition asserting that G.M.K. had threatened to commit suicide and displayed behavioral problems that required him to transfer from public school to the Northwest Human Services School.  Following an evidentiary hearing, the

juvenile court adjudicated G.M.K. dependent on January 31, 2018.[1] "The Order maintained legal and physical custody with the maternal uncle and directed the services presently ongoing be maintained." *Id*.

The child's condition continued to deteriorate and, following a subsequent hospitalization and the appointment of the guardian *ad litem* as a medical decision-maker, G.M.K. was transferred to a therapeutic foster home on May 7, 2018. The following day, the court entered an order that, *inter alia*: granted contact between Maternal Uncle and G.M.K. as directed by Denise E. Feger, PhD, who administered the child's mental health program, and denied the Agency's request to prohibit Maternal Uncle's contact with G.M.K. The court also "appointed the Agency as Medical Decision[-]Maker." *Id*. at 7.

After the child continued to regress in the therapeutic foster home, on June 14, 2018, the court "reluctantly" transferred G.M.K. to Southwood Treatment Center, a residential treatment facility. *Id*. at 8. On August 22, 2018, the court returned the medical-decision-making rights over G.M.K. to Maternal Uncle. G.M.K.'s aggressive and violent behavior decreased during the fall of 2018 but the Agency recommended against returning G.M.K. to Maternal Uncle's care because there had been an insufficient number of home visits while the child was hospitalized. The juvenile court "implemented a

---

[1] As outlined in the body of this opinion, the ensuing two-year history of G.M.K.'s mental health treatment is marked by both significant progress and tragic regression. It is also marred by the persistent adversarial tension between the Agency and Maternal Uncle.

schedule of 'home visits'" that would "culminate in [G.M.K.]'s return to [M]aternal [U]ncle's care and residence in March, 2019." *Id*. at 9.

Unfortunately, the anticipated reunification never materialized. G.M.K.'s condition declined, and the court ultimately abandoned its schedule of home visits and maintained G.M.K.'s placement at Southwood. It reasoned, G.M.K. "had decompensated at Southwood after the extensive home visitation schedule was implemented and had been ongoing for several months." *Id*.

Significantly, the relationship between Maternal Uncle and the Agency continued to deteriorate during this period. As reported by the juvenile court,

> The Agency accused Maternal Uncle of using alcohol and marijuana while transporting [G.M.K.] for visits. [Maternal Uncle] submitted to a drug test administered by the Agency[,] which was negative for all substances. The Agency also requested a Behavioral Health Evaluation of Maternal Uncle due to the Agency's allegations that [his] "ongoing outbursts" toward Agency personnel and [his] refusal to discuss [G.M.K.]'s medication management with Southwood staff.

*Id*. (cleaned up). Shortly after this setback, the juvenile court appointed a psychologist who had previously had contact with G.M.K., Robert Meacham, to review the matter and provide fresh recommendations to the court. *Id*. at 9-10.

Following the appointment of Mr. Meacham, Maternal Uncle's situation improved. With the Agency's assistance, Maternal Uncle made preparations to relocate to McKean County, Pennsylvania to utilize family support in parenting G.M.K. The juvenile court noted Maternal Uncle's continued concern for his nephew's wellbeing, as exemplified by his frequent contact with G.M.K.

and his participation in a ten-week anger management course. As described by the juvenile court, Maternal Uncle had been "working diligently and effectively in this therapeutic process and has been making significant strides and improvements in managing his anger." *Id*. at 10.

As a result of these improvements, on May 20, 2019, G.M.K. was released from Southwood and again placed in the legal and physical custody of Maternal Uncle. However, G.M.K. regressed several weeks later and was returned to Southwood due to his physically violent behavior. The court transferred him to the Beacon Light STAR Program ("Beacon Light") one month later. Throughout this period, the Agency was adamant that it was not appropriate to return G.M.K. to Maternal Uncle's residence in the child's condition at that time. Six months later, at the request of the Agency, the juvenile court "reluctantly" suspended Maternal Uncle's contact with G.M.K. for eight weeks because the Agency alleged that he was a trigger for G.M.K.'s violent behavior. *Id*. at 12. On March 17, 2020, the juvenile court lifted the no-contact condition in order to permit telephone contact between G.M.K. and his uncle.

Shortly after his contact with G.M.K. was reinstated, Maternal Uncle filed a petition to remove G.M.K. from Beacon Light due to concerns related to COVID-19. Despite the court's concerns, it maintained G.M.K.'s placement at Beacon Light but directed the facility to draft a list of services that G.M.K. would need if it became necessary to discharge the child to home during the pandemic. The facility balked at this directive because **it** had not

recommended discharge. As the trial court later articulated, "Beacon Light's response to this [c]ourt's direction was a symptom of this [c]ourt's later struggles with this facility." *Id*. at 13-14.

Fortunately for G.M.K., the Agency was able to provide the requested information to the juvenile court independently and, in June 2020, "the court directed the Agency to continue planning for [G.M.K.]'s discharge to [the] home of the maternal uncle." *Id*. at 14. In September 2020, Beacon Light provided the juvenile court notice of its intent to discharge G.M.K. without a discharge plan and against medical advice, due to his physical and violent behavior.

The following week, after an extrajudicial meeting to discuss G.M.K.'s impending discharge from Beacon Light and potential future placement, *see* N.T., 9/15/20, at 3-5, the juvenile court conducted a status hearing via Zoom due to COVID-19. Maternal Uncle was present remotely and represented by counsel. G.M.K., who was initially present remotely, was represented by a guardian *ad litem*, who supported placement with Maternal Uncle.[2] *Id*. at 3-4, 34. Among other witnesses, the court heard from Dr. Ernesto Roederer,

_____

[2] Notably, the guardian *ad litem* argued in support of return to Maternal Uncle. N.T., 9/15/20, at 86-87 (arguing, in relevant part, "I really -- I understand where the Agency is coming from as far as safety of the community, safety to [G.M.K.]. But the definition of insanity is trying the same thing multiple times and expecting a different result. This case is a case study in the failures of congregate care, in my opinion. There has been little to no progress made at Beacon Light."). Subsequent to order of this Court directing he file a brief, he also submitted a brief to this Court in support of that position and the juvenile court's order.

G.M.K.'s treating psychiatrist at Beacon Light who recommended G.M.K. be placed at George Junior Republic, and Mr. Meacham who supported reunification with Maternal Uncle.[3] While the agency endorsed Dr. Roederer's recommendation, Maternal Uncle supported Mr. Meacham's recommendation to return G.M.K. to Maternal Uncle's custody in McKean County. At the conclusion of the hearing, the court ordered, among other things, that G.M.K. be returned to the legal and physical custody of Maternal Uncle upon discharge from Beacon Light. *Id*. at 87.

The court subsequently explained its rationale in elevating Mr. Meacham's recommendation over that of Dr. Roederer as follows:

> Dr. Roederer's contact with [G.M.K.] was limited to approximately three (3) or four (4) contacts over the course of over a year that [G.M.K.] was at Beacon Light. Dr. Roederer's testimony consisted of conclus[ory] statements without factual discussion to support said conclus[ory] statements. Dr. Roederer had opined at an earlier hearing that the therapy at Beacon Light was beginning to be effective with this child which proved to be absolutely not true. However, the Agency utilized Dr. Roederer's statement to argue to this [c]ourt to maintain [G.M.K.] at the Beacon Light facility. This [c]ourt did not believe Dr. Roederer's testimony offered at the hearing of September [15], 2020. Instead[,] this [c]ourt accepted as true and factual, the testimony of Robert J. Meacham, M.S., Licensed Psychologist. Psychologist Meacham had been involved in this child's life for several years, being utilized by this [c]ourt to attempt to obtain the best possible treatment for [G.M.K.]. Psychologist Meacham recommended strongly to this [c]ourt not to place this child at George Junior Republic and had specific reasons for that recommendation. As stated above, this [c]ourt believed the facts as presented by

---

[3] The court additionally heard the testimony of Chelsea Heatley, G.M.K.'s therapist at Beacon Light, and Jill Yablonski of George Junior Republic.

Psychologist Meacham and the opinions and recommendations of Psychologist Meacham.

Juvenile Court Opinion, 10/7/20, at 18.

On September 17, 2020, the court entered the above-captioned order memorializing its conclusion.[4] This timely appeal followed.[5] The Agency complied with Pa.R.A.P. 1925(a)(2)(i) by attaching a concise statement of errors complained of on appeal to its notice of appeal, and the juvenile court authored a cogent opinion addressing those issues.[6]

The Agency raises the following issues for our review:

1. Whether the [juvenile] court erred and abused its discretion by placing the dependent child in the legal and physical custody of maternal uncle and improperly disregarding the testimony of the child's treating psychiatrist that said placement would present a great safety risk and was against medical advice.

2. Whether the [juvenile] court's decision to place the dependent child in the legal and physical custody of maternal uncle was against the weight of the evidence in that the [juvenile] court improperly disregarded the testimony of the child's treating psychiatrist that said placement would present a great safety risk and was against medical advice and erroneously concluded that

_____

[4] Pursuant to motion of the Agency, by order dated September 29, 2020, and entered September 30, 2020, the court clarified its order "to reflect that medical and educational decision-making rights shall transfer to [Maternal Uncle], effective September 26, 2020." Order, 9/30/20, at ¶2.

[5] The juvenile court denied the Agency's application for stay pending appeal.

[6] While the juvenile court complained that the Agency's Rule 1925(b) statement was too vague, we decline to find waiver because the issues stated therein were readily discernible, as evidenced by the juvenile court's thorough opinion. **See** Juvenile Court Opinion, 10/7/20, at 18-21. **Cf**. *Lineberger v. Wyeth*, 894 A.2d 141, 148 (Pa.Super. 2006) (citation omitted) ("When a court has to guess what issues an appellant is appealing, that is not enough for meaningful review.").

- 8 -

the court-appointed psychologist strongly recommended placement with uncle.

3. Whether the trial court's decision to place the dependent child in the legal and physical custody of maternal uncle was erroneous as a matter of law in light of the fact that the court failed to apply the statuory [sic] requirement that said return be in the best interest of the safety of the child, given that the [juvenile] court improperly disregarded the testimony of the child's treating psychiatrist that said placement would present a great safety risk and was against medical advice and erroneously concluded that the court-appointed psychologist strongly recommended placement with uncle.

Agency brief at 2-3. Maternal Uncle did not file a brief.

First, we first set forth our standard of review of the juvenile court order:

When reviewing a dependency case, we accept the trial court's findings of fact and credibility determinations that are supported in the record. However, we are not required to accept the court's inferences or conclusions of law. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). We review for an abuse of discretion. *In Interest of L.Z.* [111 A.3d 1164, 1174 (Pa. 2015)].

*In re N.S.*, 237 A.3d 546, 550 (Pa.Super. 2020). Phrased differently, "[t]he trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The Agency combines its issues for purposes of its brief and argues that the court erred and abused its discretion with its order as to G.M.K.'s

placement and/or custody upon discharge from Beacon Light.[7] Agency brief at 19. In its first two arguments, which we address collectively, the Agency essentially challenges the court's determination as to credibility and/or weight of the evidence.

The Agency maintains that, "[w]hile the [juvenile] court has correctly identified its latitude of discretion in evaluating the credibility of witnesses," the court erred in finding Dr. Roederer not credible in so far as the court's determination was not supported by the record. *Id*. It contends:

> The [juvenile] court opinion identifies three reasons that it did not find Dr. Roederer credible: (1) that his contact with the child was limited to approximately three (3) or four (4) contacts over the course of over a year that the child was at Beacon Light; (2) that his testimony consisted of conclusiory statements without factual discussion to support said conclusiory statements; and (3) that he had opined at an earlier hearing that the therapy at Beacon Light was beginning to be effective with this child which proved to be absolutely not true. The [juvenile] court also noted in its opinion a potential fourth reason for its determination: that, in its view, "progress with the child's therapy was promised earlier this year by Beacon Light and Dr. Roederer, Beacon Light now claims no progress was made, and Beacon Light no longer desires the child at Beacon Light's facility. Each of these bases for the court's decision, however, are unsupported by the evidence and the [juvenile] court's reliance thereon to discount Dr. Roederer's credibility was an abuse of its discretion.

Agency brief at 20-21 (emphasis in original) (citations to record omitted).

_____

[7] The Agency combines all issues raised under one heading, suggesting this was done for "ease of review . . . as they arise out of the same underlying issues." Agency brief at 19. While we note with disapproval that the Agency's brief fails to comply with the organizational and citation requirements prescribed by our appellate rules, we decline to take any action as the defects do not hamper our appellate review.

Similarly, the Agency asserts that the court likewise erred in basing its determination on what it found to be a "strong recommendation" by Mr. Meacham. It argues that Mr. Meacham's recommendation was, in fact, qualified, *i.e.*, the discharge to Maternal Uncle would involve uncertain risk and was feasible only because it served G.M.K. better than the alternative placement in George Junior Republic, whose COVID-19 protocols would have impeded the child's contact with Maternal Uncle. ***Id***. at 25-26.

In rejecting the Agency's arguments, the juvenile court succinctly surmised as follows: "The answer to the Agency's argument on the first two (2) allegations . . . is that this [c]ourt did not believe Dr. Roederer or any of the Agency's evidence that was in conflict with Psychologist Meacham." Juvenile Court opinion, 10/7/20, at 19. We discern that the Agency's challenge to this determination is actually asking this Court to re-weigh the evidence and/or re-assess the credibility of the witnesses. This we cannot do. In accordance with the applicable standard of review, the juvenile court's determinations regarding credibility and weight of the evidence are not to be disturbed absent an abuse of discretion or lack of support in the record. ***See In re N.S.***, ***supra*** at 550; ***see also In re S.J.-L.***, 828 A.2d 352, 355 (Pa.Super. 2003).

Instantly, the certified record supports the juvenile court's determinations as to credibility and the weight of the evidence. First, the Agency's factual assertions regarding Dr. Roederer's level of interaction with G.M.K. are utterly ineffectual. While Dr. Roederer noted two additional

contacts since the four initial contacts between G.M.K.'s admission in August 2019 and April 2020, and indicated that his partner, Dr. Craig Richman, "sees the kiddos between the time," Dr. Roederer nevertheless confirmed that he delegated treatment authority to the team that provided the actual treatment, and he was advised of "critical" information. N.T., 9/15/20, at 63-64, 66. This testimony does not establish that the juvenile court disregarded any significant facts. Likewise, as it relates to Dr. Roederer's prior indication that Beacon Light's treatment was effective, the fact that he later accurately identified a period of regression does not undermines the trial court's reference to the doctor's initial statement in rendering its credibility determination in favor of Mr. Meacham. *Id*. at 32, 47-50, 66.

Furthermore, when questioned by the guardian *ad litem* as to his recommendation, Mr. Meacham supported his position with a persuasive explanation.

> [W]e have to do something. He can't just stay at Beacon Light. And my recommendation would be that we do what we can. I'm not so sure that we have any option at this point. If I understand what happens from what we were told on Friday, George Junior Republic is not willing to accept [G.M.K.] under a continued path toward reunification. One. Two, I don't believe we've found any other facility that would take him. So that leaves us with three, return home with the possibility if we could get a couple of overnights in, that Beacon Light would extend the stay there a week or two or so that we could get a couple of visits in. To me, that seems to be our only course of action. And I say that with all recognition of the risks involved.

N.T., 9/15/20, at 26. Thus, while noting a "guarded prognosis," Mr. Meacham indicated no guaranteed outcome even if G.M.K. were to remain

institutionalized. *Id*. at 15. In addition, he highlighted the involvement and support of extended family in McKean County, a distinguishing factor from when G.M.K. was previously returned to his uncle's care. *Id*. at 10-11, 14-15, 23. Mr. Meacham further referenced successful restraint training. *Id*. at 16, 22-23.

The forgoing testimony belies the Agency's contention that Mr. Meacham's recommendation was tentative. The record bears out that Mr. Meacham's position was qualified only by the reality that Beacon Light placed G.M.K. in an untenable situation and that both alternative placement options involved risks. At no point in his testimony did the psychologist equivocate from his preference to place the child with Maternal Uncle for the reasons described above. As the certified record supports the juvenile court's assessment of the experts' relative credibility and the weight of the evidence, we do not disturb it. *In re M.G.*, *supra* at, 73-74 (Pa.Super. 2004).

Finally, the Agency contends that the court erred in its application of § 6351 in excluding evidence that related to G.M.K.'s safety. *See* Agency brief at 27-29. In short, it argues: "In this case, the [juvenile] court opinion erroneously disregarded competent testimony as to the safety of the child, in an effort to accelerate permanency, and its decision therefore did not appropriately apply the safety component of a Section 6351 dispositional analysis." *Id* at 27 Invoking Dr. Roederer's favorable testimony, the agency specifically contended that the juvenile court "failed to appropriately balance

the safety interest of G.M.K. with the other interests in the context of reunification and it was in that fashion that it did not adhere to the requirements set forth in Section 6351." *Id*. at 28. It reasoned that, unless G.M.K.'s safety could not be assured at Maternal Uncle's residence, placement was not appropriate. The agency concluded: "Had the [juvenile] court properly considered this evidence regarding [G.M.K.]'s safety interest, it . . . would have ordered [G.M.K.]'s continued maintenance in a Residential Treatment Facility such as George Junior Republic while ordering as intensive efforts as possible under the COVID-19 mitigation framework to facilitate reunification." *Id*. at 29.

In addressing this issue concerning the authority to order G.M.K.'s return to the legal and physical custody of Maternal Uncle, the juvenile court reasoned:

> This [c]ourt has found that [M]aternal [U]ncle is best able to provide care, shelter and supervision and that the action to return [G.M.K.] to [M]aternal [U]ncle is best suited to the safety, protection, and physical, mental and moral welfare of [G.M.K.].
>
> In deciding whether placement of the child remains necessary, this [c]ourt must consider and did consider and assess the child's vulnerability, parental capacity and any safety threat. Return should not be based upon compliance with a Permanency Plan, but progress and mitigation of any safety threats. It is not necessary that a parent or guardian complete all programs or goals, but that the risk to the safety of the child is removed or mitigated. [*See*] Pennsylvania Dependency Benchbook 3rd Edition (2019) Section 13.6.1.
>
> In this case, [M]aternal [U]ncle has been rated to have complied with the permanency plan and progressed in alleviating the reasons for placement at every Permanency Review Hearing

- 14 -

as fully, substantially or moderately. Maternal [U]ncle has been involved and completed counseling and has completed restraint training. [G.M.K.] has been in congregate care for a substantial portion of [his] life. Although progress with [G.M.K.]'s therapy was promised earlier this year by Beacon Light and Dr. Roederer, Beacon Light now claims no progress was made, and Beacon Light no longer desires [G.M.K.] at Beacon Light's facility. Psychologist Meacham opined that it was time to have [G.M.K.] returned home. New substantial family supports were in place and [M]aternal [U]ncle had completed processes to provide a safer environment for [G.M.K.] at home.

. . . .

[G.M.K.] has been in congregate care for a substantial time[-]period. [G.M.K.] has not progressed. The [A]gency had worked significantly with [M]aternal [U]ncle in providing services and resources to [M]ternal [U]ncle. Maternal [U]ncle has relocated to McKean County at the urging of the Agency where multiple family supports are available.

Maternal [U]ncle has been involved in counseling, therapy and other programs suggested by the Agency. Maternal [U]ncle has completed restraint training as urged by the Agency. Maternal [U]ncle has complied with the Agency's many requests. [G.M.K.] suffers from a mental health disorder. [G.M.K.] had successfully completed a program at Southwood but had floundered at Beacon Light after more than one (1) year at Beacon Light. Placing [G.M.K.] at George Junior Republic (GJR) would be a substantial step back for this child[,] as GJR would isolate [G.M.K.] for two (2) weeks upon admission, would not permit on[-]ground visits by [G.M.K.]'s family[,] even for family counseling/therapy sessions, and not permit off-campus visits with family. At Beacon Light, [G.M.K.] had been receiving on-campus and off-campus visits with [M]aternal [U]ncle and other family supports. Further, GJR would not accept [G.M.K.] unless the placement was for at least six (6) months. These directives of GJR are all a major step back for [G.M.K.,] who at the time of the decision was less than eleven (11) years old.

This [c]ourt viewed the placement of [G.M.K.] at GJR as possibly causing [G.M.K.] significant trauma; not only due to being housed in a new facility but also due to the ongoing restrictions that were to be imposed at GJR.

Juvenile Court Opinion, 10/7/20, at 18-22.

As it relates to the disposition of dependent children the Juvenile Act provides:

> **§ 6351.  Disposition of dependent child.**
>
> **(a)  General rule**.--If the child is found to be a dependent child the court may make any of the following orders of disposition best suited to the **safety, protection and physical, mental, and moral welfare of the child**:
>
> > (1)  Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.
> >
> > (2)  Subject to conditions and limitations as the court prescribes transfer temporary legal custody to any of the following:
> >
> > > (i)  Any individual resident within or without this Commonwealth, including any relative, who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child.
> > >
> > > (ii)  An agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child.
> > >
> > > (iii)  A public agency authorized by law to receive and provide care for the child.
> >
> > . . . .

42 Pa.C.S. § 6351(a) (emphasis added).

Concerning permanency planning, the juvenile court is directed as follows:

> **(e)  Permanency hearings**.--

> (1) The court shall conduct a permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and **whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child**.

42 Pa.C.S. § 6351 (e) (emphasis added)

Instantly, the evidence corroborates the court's decision to return legal and physical custody to Maternal Uncle as best suited to the safety, protection, and physical, mental, and moral welfare of G.M.K. ***See*** 42 Pa.C.S. § 6351(a); ***see also In re Adoption of T.B.B., supra*** at 394. Despite the Agency's assertions to the contrary, this determination included the paramount consideration of G.M.K.'s continued safety in Maternal Uncle's care.

In recommending the return of legal and physical custody to Maternal Uncle, Mr. Meacham, the psychologist who had worked with G.M.K. since he was four or five years old, expressed apprehensions as to re-institutionalization. N.T., 9/15/20, at 12-13. He noted that, despite the extended amount of time G.M.K. has spent institutionalized, there is a lack of knowledge as to what triggers his behaviors. ***Id***. at 12. Mr. Meacham stated, "My biggest concern about re-institutionalization is that [G.M.K.] has spent a great number of years of his primary formative years in an institutional setting. And at this point, we just don't know, despite the best efforts of anybody that has served him, to what extent the trigger [is] for some of his behaviors. We would have some concern about the Agency having him continue in placement." ***Id***. at 12. Mr. Meacham additionally recognized the inability to form attachments in an institutional setting. ***Id***. at 13.

Moreover, Mr. Meacham stressed that G.M.K. would be returning to a different environment than previously experienced with Maternal Uncle, one with extended family and community support, as well as successful restraint training.[8]  *Id*. at 10-11, 14-16, 22-23.  More importantly, Mr. Meacham observed that it would be a "vastly different setting than [G.M.K.] is currently not thriving in now."  *Id*. at 15.  Importantly, Mr. Meacham had no concerns relating to Maternal Uncle's supervision.  *Id*. at 24-25.  He stated:

> Well, I think anything could happen.  It could go very, very well.  And there could be a situation where [G.M.K.] becomes oppositional, defiant, and physically aggressive.  I think that -- I don't -- I know that he would be adequately supervised.  I think we've certainly sent that message to [Maternal Uncle] and the family members up there.  They know him.  They've met with him several times over the least several months.  So I'm not concerned about the supervision.  It's simply how he would respond to structure and being told no.

*Id*. at 25.

As the certified record, including Mr. Meacham's expert opinion, supports the juvenile court's decision to place G.M.K. with Maternal Uncle with the agency's continued supervision, we discern no abuse of discretion.  While the juvenile court did not expressly invoke § 6351(a) and (e) in rendering its decision, it is clear from the court's statement of rationale that the decision was grounded upon those precise concerns.  The agency's arguments to the

---

[8] Mr. Meachum noted the importance of instituting services to support G.M.K. and Maternal Uncle and set forth the specifics of such services.  *See* N.T. 9/15/20, at 10-12.

contrary are unavailing. Accordingly, for all of the forgoing reasons, we affirm the juvenile court's order.

Order affirmed.

Judge Dubow joins the opinion.

P.J.E. Stevens concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 06/14/2021