J-A29020-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: G.K., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.M.K., MOTHER | No. 1350 EDA 2017 |

Appeal from the Order Entered March 30, 2017
in the Court of Common Pleas of Philadelphia County
Family Court at No.: CP-51-DP-0001734-2016

BEFORE: LAZARUS, J., PLATT, J.,* and STRASSBURGER, J.*

MEMORANDUM BY PLATT, J.:                    **FILED DECEMBER 08, 2017**

C.M.K. (Mother) appeals from the order and decree of the Court of Common Pleas of Philadelphia County, entered March 30, 2017, that terminated dependency court supervision of her son G.K. (Child) (born 9/07) and awarded primary physical and legal custody of Child to M.K. (Maternal Grandmother). We remand to the trial court with instructions.

The record before us supports the following recitation of the facts of this case. On August 11, 2016, Philadelphia's Department of Human Services (DHS) received a general protective services report that alleged that Child had been left unattended in a hot car in a Wal-Mart parking lot. Two days later,

_____

* Retired Senior Judge assigned to the Superior Court.

on August 13, 2016, DHS received an additional report that Child had made allegations of physical abuse as to Mother and allegations of both physical and sexual abuse as to Mother's husband, who resided with Mother.[1] The report further alleged that Child had been found walking alone in the street with a dog and cat asking strangers how to get home to Florida.

DHS obtained an order of protective custody for Child on August 14, 2016. On that same day, DHS took Child for a forensic interview at Philadelphia Children's Alliance because of the allegations of physical and sexual abuse. DHS also took him to St. Christopher's Hospital for Children to receive medical attention for abrasions on his legs and knees. When asked whether any family resources were available to serve as a kinship placement resource for Child, Mother mentioned Child had a Maternal Great-Aunt in Pennsylvania, but she lived two hours away. Child reported to the DHS investigator that he wanted to return to Florida to live with Maternal Grandmother. He had lived most of his life with Maternal Grandmother in Florida. (**See** page 6, **infra**). DHS made contact with Maternal Grandmother, who thereafter traveled from Florida to Philadelphia to serve as a placement resource for Child. Mother told DHS she would prefer that Child be placed in general foster care rather than with either of the two available kinship resources because she believed Maternal Grandmother had coached Child to

---

[1] Mother's husband is not Child's father.

make false allegations against her. Child was placed in general foster care on August 14, 2016.

At a shelter care hearing on August 17, 2016, the trial court ordered Child to remain temporarily committed to DHS and placed in his foster home pending further investigation. Both Mother and Maternal Grandmother appeared at this hearing. Mother was not to have any visitation until further order of the court. The court noted that Maternal Grandmother had expressed an interest in caring for Child.

Maternal Grandmother filed a petition for custody in Florida on August 19, 2016. (**See** N.T. Hearing, 3/02/17, at 5). She remained in Philadelphia to support Child and seek to have Child transferred from general foster care to a kinship placement with Maternal Great-Aunt, who resided in Hanover, Pennsylvania.

The trial court adjudicated Child dependent on September 7, 2016, by the agreement of all parties that Mother was presently unable to provide Child with the proper care necessary for his physical, mental or emotional health. Mother and Maternal Grandmother were offered supervised visits, and DHS was ordered to plan concurrently for Child to be placed with Maternal Grandmother in Florida via the procedures set forth in The Interstate Compact on the Placement of Children (ICPC).

Maternal Great-Aunt had appeared at the adjudicatory hearing and at several subsequent hearings as a ready and willing kinship resource. Maternal Grandmother also filed an emergency petition for special relief in the

dependency matter in Philadelphia on October 6, 2016, requesting an emergency hearing to argue that she should be granted custody of Child and that he be immediately removed from general foster care. The trial court scheduled a hearing on the petition for October 19, 2016.

At the October 19, 2016 hearing, Maternal Grandmother's counsel argued that Child should be placed with Maternal Great-Aunt in Hanover, Pennsylvania, if the trial court would not grant Maternal Grandmother immediate custody. The Child Advocate joined in the request. DHS and Mother objected, arguing that the move would disrupt reunification attempts. The trial court ordered this option explored, and granted Maternal Grandmother's motion to intervene in the dependency matter stating, "The [Maternal] [G]randmother is given status to intervene in this case based upon the *in loco parentis* status that she has with [Child]." (N.T. Hearing, 10/19/16, at 16).

After a hearing was continued on several occasions, DHS presented testimony on December 8, 2016, but time constraints resulted in a continuance, and there was no final determination regarding case disposition and the contested issue of placement.

Child moved into a different foster home on an emergency basis in late December 2016, after he presented at a visit with unexplained facial bruising, in addition to pre-existing concerns of inadequate supervision and allegations that Child was the victim of bullying by an older youth in the home.

Child had not had any reported behavioral or academic issues in Florida, but began failing all classes, frequently absconding from school, stealing, and breaking into his former foster home. He also burned his new foster brother with a clothing iron and subsequently tried to burn down his new foster home.

On March 2, 2017, the trial court held a Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) telephonic conference during a permanency review hearing. All parties were represented at the conference with the Tenth Judicial Circuit for Highlands County Florida. After extensive discussion, all parties agreed that Florida would not exercise jurisdiction over the case and the trial court would exercise jurisdiction pursuant to the UCCJEA to preside over the issues of custody and dependency. The trial court accepted jurisdiction and advised all parties that the custody matter would be entertained at the next hearing.

After the UCCJEA conference, Child testified that he wanted to return to the care of Maternal Grandmother, that he did not like the school he was attending, that he was getting in fights, and would not feel good if the judge decided he should live with Mother. (*See* N.T. Hearing, 3/02/17, at 42-48). He testified, "I don't like living with my mother, but I like living with my brother and sisters." (*Id.* at 44). He was scared of returning to Mother's home because her husband was doing "bad stuff," including, "hitting me" and "touching me in a bad way." (*Id.* at 47). He clarified for the court that he calls Maternal Grandmother, Mom, and Mother by her first name. (*See id.*). The trial court found that it was in Child's best interest to be immediately

removed from general foster care and placed with Maternal Great-Aunt, and awarded her temporary legal custody pending determination of the custody matter at the next hearing. The trial court reminded all parties that it would entertain the issue of custody at the next hearing, and twice highlighted to all parties that counsel would not be appointed given that this would become a private custody matter after the anticipated discharge of the Dependency Petition.

The trial court discharged the dependency on March 30, 2017, excused the parties that were involved solely in the dependency proceeding, and granted the Child Advocate's request to represent Child in the custody case. The trial court provided all parties with copies of the Florida petition and noted that jurisdiction had been properly conferred on the trial court based on the UCCJEA procedure allowing for such a transfer.

Maternal Grandmother was the first witness to testify in the custody proceeding. She testified that Child had been living with her since his birth in September of 2007. (*See* N.T. Hearing, 3/30/17, at 18). Although Mother initially resided in the home with Child, Maternal Grandmother explained that Mother moved out in January of 2008, leaving Child in her care. (*See id.* at 17). Maternal Grandmother testified that, since that time, she and her husband had, until the events of the past year, created a stable life for Child in Florida, where Child was known locally as a baseball "all star" and thrived socially, academically, and athletically. (*Id.* at 25; *see id.* 25-35).

Maternal Grandmother testified that she and her husband have provided the caretaking duties for Child throughout his life, including, but not limited to ensuring that they met his school, medical, emotional, and other needs. (*See id.* at 25-26). She described a typical day for Child while in her care in Florida and emphasized his passion for baseball. (*See id.* at 25-28). Maternal Grandmother testified that Child's teachers, baseball coaches, and friends regard Maternal Grandmother and her husband as Child's primary "parental" resources. (*Id.* at 31; *see id.* at 29).

Maternal Grandmother supported her testimony regarding her parental role with a notarized affidavit executed July 6, 2010, between Maternal Grandmother and Mother that formalized their mutual agreement, at that time, that Maternal Grandmother would have legal and physical custody of Child, along with full authority over making any and all of his medical and educational decisions. (*See id.* at 38-40). Mother objected to the entry of this affidavit stating, "The purpose of that document is because I had a warrant out for my arrest and I knew I was going to be incarcerated for about three months." (*Id.* at 40). After Mother confirmed that she had signed the document, the trial court overruled her objection and admitted the affidavit. (*See id.* at 41). Maternal Grandmother testified that the rights conferred to her in the affidavit had never been revoked. (*See id.* at 39).

In explaining how the events leading to Child's adjudication began, Maternal Grandmother testified that on July 6, 2016, Mother showed up at her house and stated that she was taking Child to Philadelphia for a few weeks,

but promised to return him in time for school in early August. (*See id.* at 22-23).

Describing her relationship with Child as compared to Mother's relationship with him, Maternal Grandmother testified, "[Child] only knows my husband and I [sic] as his parents. My daughter, when she—she lives in the same town we do, a small community, when she has come over, she doesn't make a real effort to interact with him. It's more like a sister brother relationship." (*Id.* at 53).

Maternal Grandmother further testified that she had recently spoken to Child, who had expressed his continuing desire to return with her to Florida. (*See id.* at 61). She stated that Child was afraid of returning to Mother's care and that she was aware of the fact that Child had recently been refusing his visits with Mother. (*See id.*). Maternal Grandmother indicated her eagerness to be again able to provide a stable, safe, consistent life for Child, explaining, "I have been doing it from the day he was born. . . . [W]e would always be there to take care of him[.]" (*Id.* at 34). Maternal Grandmother emphasized that Child had no family support or community ties to Philadelphia besides Mother. (*See id.* at 33). On the other hand, he has relationships with a variety of extended family members, friends, and baseball coaches, and teachers in Florida.

Describing Child's life in Florida with her, Maternal Grandmother emphasized that, "baseball is his passion." (*Id.* at 28). Maternal Grandmother and her husband support this passion by enabling him to play

ten months out of the year, registering him with a travel team, paying for all of his equipment and associated fees, and attending his games. (*See id.* at 28-29). On the other hand, she testified that Mother had never helped defray these costs or supported or encouraged Child's love of baseball in any capacity. (*See id.* at 30). Despite frequently being within ten miles of the field where Child often played and practiced, Mother never attended any of Child's games. (*See id.* at 29). During cross-examination, Maternal Grandmother acknowledged that Mother attended one of Child's practice sessions with her step-children and husband, but never attended any of his games. (*See id.* at 57).

Marni Stone, Child's child advocate social worker, testified that she had formed a close relationship with Child in the months since the case opened through frequent contact via visits and telephone. (*See id.* at 66). Ms. Stone testified that Child had expressed on numerous occasions his desire to go back to Florida and live with Maternal Grandmother. (*See id.* at 67). In fact, she noted that Child recently confided in her that, if he were placed with Mother and not Maternal Grandmother, he would run away again. (*See id.*). Ms. Stone opined that it would be in Child's best interest to return to Florida to live with Maternal Grandmother, the person he views as his mother. (*See id.*). Finally, Ms. Stone presented a letter, dated February 28, 2017, written by Child, in which he explained, "all I want to do is go back home with mommy who is my grand mom. I am scard (sic) to go back to [Mother]'s." (*Id.* at Child Advocate Exhibit 1; *see id.* at 70).

Kharyee Connors, Child's Community Umbrella Agency (CUA) case manager, testified that Child had expressed a desire to live with Maternal Grandmother. (*See id.* at 81).

During her testimony, Mother admitted, "[Child] loves his grand mom. There's no denying that." (*Id.* at 87). She stated that the allegations of sexual and physical abuse first arose in 2009, and that she continues to have to endure similar allegations being made against her husband. (*See id.* at 86). She opined that all of the allegations have come from Maternal Grandmother and not Child, and that they are untrue. (*See id.*). Mother stood by her testimony that Maternal Grandmother had coached Child to make false allegations through the years despite evidence that Child had stood by the truth of his allegations throughout the dependency proceeding, continuing to report them independently in, for example, his Psychological Evaluation. (*See id.* at Child Advocate Exhibit 2, Psychological Evaluation, at 11-13).

Mother testified that she has a "loving family" with her husband and that "there's nothing wrong in our household." (N.T. Hearing, 3/30/17, at 102). When directly asked if there had been incidents of domestic abuse or physical or verbal abuse between her and her husband, Mother testified, "None at all." (*Id.* at 104). However, on cross-examination, Child's counsel produced reports from the Highland County Florida Sheriff's Office for domestic incidents that had occurred on January 14, 2015, July 2, 2015, June 6, 2013, December 19, 2011, and May 20, 2010. (*See id.* at 105-09). Mother conceded that the

reports stated they pertained to incidents between herself and her husband. (*See id.*).

Mother testified that she lived with Maternal Grandmother at the time that Child was born, and subsequently obtained her own apartment, but after two months, returned to Maternal Grandmother's home and resided there until she got married in 2011. (*See id.* at 83). She and her husband then moved to Philadelphia for approximately a month. Mother, however, did not like Philadelphia so they returned to Florida and resided with her husband's sister. According to Mother, the family then relocated to their own apartment where they resided for the next year. Mother claimed that Child resided with her during this entire time. (*See id.* at 83-84). Mother stated that, in 2012, she and Maternal Grandmother agreed that Child would return to Maternal Grandmother's home, but, according to Mother, she was at Maternal Grandmother's home "every single day" up until the time that she took Child from Maternal Grandmother in 2016. (*Id.* at 85).

On cross examination, Maternal Grandmother's counsel questioned Mother regarding her statement that she resided with Maternal Grandmother until the time that she got married. Mother confirmed that statement was correct. (*See id.* at 96). Counsel then proceeded to question Mother regarding eleven addresses in Florida and Pennsylvania that were connected with her name. (*See id.* at 96-100). When counsel suggested that it appeared that she had not had stable housing during Child's life, Mother

responded that the statement was not correct as "I have had a roof over my head[.] " (*Id.* at 100).

Also, on cross-examination by Maternal Grandmother's counsel, Mother testified that she still believes Child was better off in foster care for the past seven months rather than with kin, in spite of everything he had endured. According to Mother, if Child had been placed with Maternal Great-Aunt during the case, Maternal Great-Aunt would have manipulated Child in the same ways she alleged Maternal Grandmother manipulated him. (*See id.* at 103). Mother admitted that she had been involved with Children and Youth Services in both Florida and in Pennsylvania. (*See id.* at 110). She was unaware that Child had been diagnosed with "adjustment disorder with mixed disturbance of emotion[,] conduct post-traumatic stress disorder, suspected victim of sexual abuse, [and] suspected victim of physical abuse," despite being present at past hearings where Child's psychological evaluation was discussed and entered into evidence. (*Id.* at 109; *see id.* at 110).

On March 30, 2017, the trial court entered its order terminating court supervision of Child and its decree awarding permanent physical and legal custody of Child to Maternal Grandmother.

Mother filed her notice of appeal and concise statement of errors complained of on appeal on April 24, 2017. The trial court filed an opinion on June 19, 2017. *See* Pa.R.A.P. 1925.

Mother presents the following issues for our review:

[1)] Whether the [trial] court erred by granting standing to the [M]aternal [G]randmother in the custody [case] where she did not have standing pursuant to Pennsylvania law to be a party to the dependency or custody proceeding before the [trial] court and [M]aternal [G]randmother did not file a petition for custody in Philadelphia County?

2) Whether the trial court erred when it discharged the dependency petition and awarded custody to [M]aternal [G]randmother where it did not properly weigh and place on the record the factors for determining custody pursuant to 23 Pa.C.S.[A]. § 5328(a)?

3) Whether the trial court erred when it discharged the dependency petition and awarded custody to [M]aternal [G]randmother where [Child] did not appear at the hearing to express his desires to the [trial] court?

4) Whether the trial court erred when it discharged the dependency petition and did not return [Child] to [M]other when she was ready, willing and able to care for [Child] and had no dependency issues in her house?

(Mother's Brief, at 5).

Our scope and standard of review is as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***C.R.F., III v. S.E.F.***, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

We have stated,

- 13 -

> [T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

***Ketterer v. Seifert***, 902 A.2d 533, 540 (Pa. Super. 2006) (citation omitted).

The primary concern in any custody case is the best interests of the child. "The best interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." ***Saintz v. Rinker***, 902 A.2d 509, 512 (Pa. Super. 2006) (citation omitted).

We must accept the trial court's findings that are supported by competent evidence of record, and we defer to the trial court on issues of credibility and weight of the evidence. "[I]f competent evidence supports the court's findings, we will affirm even if the record could also support the opposite result." ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

Additionally:

> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

***S.M. v. J.M.***, 811 A.2d 621, 623 (Pa. Super. 2002) (citation omitted).

The trial court has written a comprehensive opinion setting forth, in detail, the facts of this case and has explained the rationale for its decision to return Child to his Maternal Grandmother's care in Florida. However, we observe that the trial court's failure to explain its reasoning considering each of the custody factors enumerated in 23 Pa.C.S.A. § 5328(a), prevents us from considering the appeal at this time.

In ordering a custody modification, the trial court is required to consider sixteen factors set forth in 23 Pa.C.S.A. § 5328(a). Section 5328(a) provides:

> In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
>
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>
> (3) The parental duties performed by each party on behalf of the child.
>
> (4) The need for stability and continuity in the child's education, family life and community life.
>
> (5) The availability of extended family.
>
> (6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

After considering the sixteen custody factors enumerated in section 5328, a trial court may award one of several types of custody to a party. *See* 23 Pa.C.S.A. § 5323(a). Section 5323 mandates that, when the trial court awards custody, it "shall delineate the reasons for its decision **on the record in open court or in a written opinion or order**." *Id.* at § 5323(d)

(emphasis added); *see **C.B. v. J.B.**, et al.*, 65 A.3d 946, 951 (Pa. Super. 2013), *appeal denied*, 70 A.3d 808 (Pa. 2013). "**All** of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order." ***J.R.M. v. J.E.A.***, 33 A.3d 647, 652 (Pa. Super 2011) (citation omitted; emphasis in original).

Our review of the record reveals that the trial court, while stating that it considered all the factors, did not, in its opinion or on the record in open court, discuss all the factors listed in section 5328(a), only those that it found significant. We are constrained, therefore, to remand this matter to the trial court with instructions to submit an opinion to this Court, within thirty days, in which it discusses each of those factors. The order and decree of the trial court shall remain in effect pending the trial court's response to this Court.

Case remanded, with instructions. Panel jurisdiction retained.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/8/2017