J. A02042/20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| K.P., | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | No. 1376 WDA 2019 |
| | : | |
| S.P. | : | |

Appeal from the Order Entered August 23, 2019,
in the Court of Common Pleas of Beaver County
Civil Division at No. 13011 of 2010

BEFORE:  SHOGAN, J., OLSON, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED FEBRUARY 14, 2020**

K.P. ("Father") appeals from that part of the August 23, 2019 custody order entered in the Court of Common Pleas of Beaver County that modified the preceding consent custody order with respect to C.P., natural male child of Father and S.P. ("Mother"), by changing C.P.'s school district and modifying Mother's and Father's custody dates and times.  We affirm.

The record reflects that Mother and Father had been married and are now divorced.  In addition to being the natural parents of C.P., Mother and Father are also the natural parents of B.P.  We refer to C.P. and B.P. collectively as the "Children."

We glean the following from the trial court's August 23, 2019 opinion: Father filed a complaint for custody of the Children on November 11, 2010, that resulted in the entry of a consent custody order on January 27, 2011,

wherein the parties agreed to share legal and physical custody of the Children. On August 11, 2011, Father sought modification. Following the entry of a proposed custody order and exceptions filed thereto by Father, the parties entered into a consent custody order on February 6, 2012, wherein they agreed to share legal and physical custody and wherein they also agreed that the Children would attend public school in Upper St. Clair, Allegheny County. On February 5, 2013, Father filed a petition to modify the February 6, 2012 consent custody order, which he later withdrew.

On February 21, 2017, Mother filed a petition for psychological counseling for the Children and for co-parenting counseling. The trial court scheduled a hearing on the matter. On May 16, 2017, Mother and Father entered into a consent order wherein they agreed to the appointment of a guardian *ad litem* ("GAL") to represent the Children. Thereafter, following the hearing held on Mother's petition for psychological counseling for the Children and for co-parenting counseling, Mother and Father entered into a consent order on July 24, 2017, wherein they agreed to have the Children psychologically evaluated, to follow any and all recommendations of the evaluator, and to participate in co-parenting counseling. By October 27, 2017, however, Father had failed to cooperate with effectuating the Children's psychological counseling and had refused to begin co-parenting counseling. As a result of a petition filed by Mother, the trial court entered an order on November 20, 2017, that ordered Mother and Father, pursuant to the July 24,

2017 consent order, to have the Children begin psychological counseling. By separate order entered on the same date, the trial court directed that co-parenting counseling remain open pending further action.

On May 3, 2018, Mother filed a contempt petition against Father, alleging that B.P. had failed to visit with Mother pursuant to the existing custody order. Thereafter, Mother filed an amended contempt petition. On May 8, 2018, Father filed a petition to modify the existing custody order, requesting that he be awarded physical custody of B.P. The trial court issued a proposed custody order, and Father filed exceptions. On July 19, 2018, the trial court consolidated Mother's contempt petitions and directed that they be heard on August 23, 2018, with Father's exceptions to the proposed custody order. Thereafter, a mediation was scheduled, but it proved unsuccessful.

On December 12, 2018, the trial court conducted *in camera* interviews of the Children. On December 14, 2018, the parties stipulated to an abbreviated trial in which they would testify in a limited capacity. The parties also stipulated to the admission of all exhibits and waived a detailed best-interest analysis of the 16 factors under 23 Pa.C.S.A. § 5328(a) as concerned C.P. The parties further agreed to follow the GAL's recommendation regarding B.P.'s custody.

Following trial, the trial court made the following findings of fact:

> [Mother and Father] love [the C]hildren. B.P. is seventeen (17) years old and has completed the tenth (10th) grade, and C.P. is fourteen (14) years old and has completed the eighth (8th) grade. The

[C]hildren have attended public school in the Upper St. Clair School District since 2012. During the 2018/2019 school year, B.P. started school at 7:20 a.m. and C.P. started school at another school within the district at 8:30 a.m.

The parties are divorced and have both since remarried. Father has resided in Upper St. Clair, Allegheny County for approximately eight (8) years. He resides with T.P. ("Step-Mother") and their daughter, along with Step-Mother's son from a previous relationship, and the two (2) [C]hildren to this action fifty percent (50%) of the time. Father is employed as a clinical consultant manager. Step-Mother has been a pilates instructor for eight (8) years, and was previously employed as an office manager for her family-owned company. Father is required to travel with his job, but typically works daylight, finishing at approximately 5:30 p.m. – 6:00 p.m. Mother has continually resided in Beaver, Beaver County with S.M. ("Step-Father") and their daughter and the two (2) [C]hildren to this action fifty percent (50%) of the time. Mother is the owner of a pizza shop in Beaver and manages real estate ventures. Mother's work schedule is flexible. Step-Father is a mortgage broker and manages fifteen (15) properties in Pennsylvania and Florida.

The parties maintained a shared Custody Order, as it pertained to C.P. Mother testified that the shared schedule was not working. During Trial, Father testified that the shared schedule for C.P. was working; previously he had said the schedule was not working.

The parties reside approximately forty-five (45) minutes away from each other. Mother has been responsible for the majority of the transportation required by the Order. Mother has utilized accommodations offered at Upper St. Clair, as to the school arrival and departure times for the [C]hildren, to assist her with the distance she has to travel to get the [C]hildren to school on her days of custody.

Father and Step-Mother were opposed to those accommodations, as was B.P.

B.P.'s and C.P.'s doctors, medical, vision, and dentist have remained in Beaver County. The [C]hildren's pediatrician, in 2017, along with a subsequent psychological evaluation that had been agreed upon, recommended counseling for the [C]hildren. Testimony indicated the counseling was for a motor tic of C.P. and issues that Mother saw that the [C]hildren were experiencing. The [trial c]ourt, at the request of Mother, was required to intervene to have the counseling begin per the recommendation of the psychological evaluation. Father remained opposed to the counseling to which he had agreed.

In October of 2018, the parties attended one (1) intake session of court–ordered co-parenting counseling and have not resumed. Mother attended separate counseling as recommended by the co-parenting counselor. Father was not willing to voluntarily attend further co-parenting counseling.

In December of 2018, Father testified his work schedule was flexible, and he could assist with transportation. In June of 2019, Father testified he was willing to assist with transportation around his work schedule, but he would not be able to transport until approximately 5:30 p.m. or 6:00 p.m., after his work hours, or on weekends. In Father's proposed custody schedule submitted on August 8, 2019, his transportation recommendation was different than his prior testimony, in that he was now able to transport in the mornings to school. Step-Mother testified that she could not assist with transportation due to her work schedule, which she was not willing to change, and her family schedule. Mother's testimony was consistent, in that her work schedule is flexible. Step-Father assists Mother with transportation.

The long procedural history portion of this Opinion accurately reflects the lengthy and contentious nature of this case. Most recently, the tension between the parties began with the older minor child, B.P., and his

resistance in following the Custody Order during Mother's periods of custody. In February of 2018, for reasons disagreed upon by the parties, B.P. began to refuse to visit Mother pursuant to the Custody Order and Father did not follow the Order. Mother did not see B.P. for lengthy periods of time and filed a Contempt Petition and an Amended Contempt Petition.

Although the parties blamed each other for the issues which transpired surrounding custody of B.P., they reached a new agreement during Trial as to custody of B.P., as recommended by the GAL, in which B.P. spent less time with Mother and more time with Father. While Father agreed to the GAL's recommendation, he testified that he thought it would be best for B.P.'s emotional well-being to spend even less time with Mother.

At Trial, Mother testified that B.P. was beginning to revert back to his "old self" in the past two (2) months and he was attending visits pursuant to the parties' new agreement. Because the parties reached a resolution as to custody of B.P., the Trial was for custody of C.P. The [trial c]ourt is pleased to hear B.P. is maintaining a relationship with both parents.

C.P. was described by multiple witnesses as a popular, honest, well-liked, and adaptable adolescent who is a natural leader. C.P. is passionate about sports, specifically football, and has excelled in both his school team at Upper St. Clair and a recreational league in Beaver County. C.P.'s assistant football coach, T.W., from Upper St. Clair and the football coach, Dr. J.B., from Beaver both testified for the parties, at length, as to their respective football requirements and schedules. Both parties demonstrated an interest and desire for C.P. to participate in a school football program.

Upper St. Clair School District has a back to school information form, which has a hierarchy as to the parent residing in the school district. The parent not residing in the school district is considered secondary;

thus, the secondary parent gets only the secondary emails. The parent in the school district receives all emails concerning the [C]hildren. An example of the email hierarchy was the lack of notice when a 504 meeting was held at Upper St. Clair for one (1) of the [C]hildren which Father and Step-Mother attended. No notice of this meeting was sent to Mother. Teachers email the in-district parent and have not always recognized there was a secondary parent, an outside-the-district parent. Mother was able to be placed on some email chains. Step-Mother was on most emails with Mother and Father; Step-Father was not.

Academically, C.P.'s middle school principal, J.D., testified that C.P.'s percentage grades translated into mostly B's and C's, but he believed C.P. has the potential to be a B-student. J.D. also testified that C.P. did well in classes with "tougher" teachers, and that C.P. needed to become more focused. A review of C.P.'s grades reflected some grades lower than C's, and that his grades had deteriorated from 7th grade to 8th grade.

C.P. has had some recent disciplinary issues, both in and out of school. C.P. is described as being very honest and forthcoming to his parents and adults; he admitted to his parents that he and a friend bought and tried marijuana while at Mother's during her custody. C.P.'s principal, J.D., stated that C.P. had some adolescent behavior-type disciplinary problems. C.P. brought a razor to school with the intention of using it to cut his friend's hair. C.P. was present during a fight off school grounds, which was recorded on a cell phone. Another incident, revealed in exhibits submitted, showed a call was made by the school concerning C.P. for being disrespectful towards females. Another call from the school occurred concerning C.P.'s phone and swearing to a teacher. C.P. did not specifically recognize these issues as major problems or concerns. There was also testimony that C.P., along with a friend from Upper St. Clair, carved a swastika on his calf. The extent to which C.P. was disciplined by the parties for these

incidents was a point of contention at Trial, with the parties disagreeing as to the proper way to address the aforementioned situations, or whether to discipline C.P. at all.

While in Mother's custody, C.P. works part-time at Mother's pizza shop and works on real estate flipping with his [M]other and [S]tep-[F]ather. C.P. and B.P. attend church with Mother and Step-Father. C.P. weightlifts in Upper St. Clair and in the Beaver area at a facility, "Country Strong[."] He played on the 8th grade football team in Upper St. Clair, as well as played lacrosse and wrestled, and he played on a recreational football team in Beaver. C.P. has friends in both Upper St. Clair and Beaver.

At the time of Trial, Mother proposed that she be awarded custody of C.P. during the school year on a two-week rotating schedule. During the first week, Mother would exercise custody Monday through Friday and during the second week, Monday through Saturday. As such[,] Mother proposed C.P. attend school in the Beaver Area School District.

Conversely, Father proposed no changes be made to the school or custody schedule pertaining to C.P., but did offer to assist with transportation. Father stated that he would request weekend custody time with C.P. if he were to attend Beaver Area School District.

After Trial and pending a written Opinion and Order, [the trial c]ourt issued an Order on July 31, 2019 designating the school district in which C.P. would be attending. Additionally, since the custody schedule proposals presented by the parties at Trial were not specific, and Father's availability for transportation was conflicting, the July 31, 2019 Order also directed the parties and GAL to submit a proposed custody schedule with C.P. attending the Beaver Area School District by the close of business on August 8, 2019.

On August 1, 2019, the [trial c]ourt issued an Order extending the date for which [the trial c]ourt had to enter a decision for a period not to exceed fifteen (15)

days from the date the custody schedule proposals were due in order for the [trial c]ourt to consider said proposals.

On August 7, 2019, Mother filed an Emergency Special Relief Petition, seeking an Order requiring Father to permit C.P. to attend mandatory football practices. Father reasoned that a football schedule was not built in to the existing Order and would not permit C.P. to participate or attend the practices in the Beaver Area School District. Argument was held by counsel of record for both parties and the GAL and a Temporary Custody Order, in the best interest of C.P., was issued.

On August 15, 2019, Father, through counsel, filed an Emergency Motion for Reconsideration of the [trial c]ourt's July 31, 2019 Order, specifically requesting the [trial c]ourt to reconsider the school district. The Motion was denied after argument by counsel for the parties. The GAL acknowledged at the Motion that C.P. was doing well.

Trial court opinion, 8/23/19 at 4-8.

On August 23, 2019, the trial court entered the custody order which, among other things, modified C.P.'s custody schedule and required that C.P. be enrolled in and attend the Beaver Area School District beginning in the 2019/2020 school year. Father filed a timely notice of appeal, together with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The trial court then filed a Rule 1925(a)(2)(ii) opinion.

Father raises the following issues for our review:

1. Whether the [t]rial [c]ourt erred in modifying the custody order in a fashion as to separate two teenage [sic] brothers in a significant fashion and requiring the brothers to attend

different schools in different districts for their high school years[?]

2. Whether the [t]rial [c]ourt erred in modifying the previous existing Order of Court regarding custody and in doing so required the younger child to transfer to a different school district in a different county[?]

3. Whether the [t]rial [c]ourt erred in modifying the custody order so as to provide significantly less custodial time to [F]ather who had previously enjoyed a shared custody arrangement with [C.P.?]

Father's brief at 13.

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. This Court must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. We defer to the credibility determinations of the presiding trial judge, who viewed and assessed the witnesses first-hand. We, however, are not bound by the trial court's deductions or inferences from its factual findings, and ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the trial court's conclusions only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

When a trial court orders a form of custody, the best interest of the child is paramount. A non-exclusive list of factors a court should consider when awarding custody are set forth at 23 Pa.C.S.A. § 5328(a).

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2)    The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1)    The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3)    The parental duties performed by each party on behalf of the child.

(4)    The need for stability and continuity in the child's education, family life and community life.

(5)    The availability of extended family.

(6)    The child's sibling relationships.

(7)    The well-reasoned preference of the child, based on the child's maturity and judgment.

(8)    The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9)    Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10)    Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.[A.] § 5328(a).

***P.J.P. v. M.M.***, 185 A.3d 413, 417-418 (Pa.Super. 2018) (internal citations,

quotation marks, and brackets omitted).

Following consideration of the factors set forth in Section 5328(a), the

trial court may award any of the following types of custody, so long as it is in

the best interest of the child:

(1) Shared physical custody.

(2) Primary physical custody.

(3) Partial physical custody.

(4) Sole physical custody.

(5) Supervised physical custody.

(6)    Shared legal custody.

(7)    Sole legal custody.

23 Pa.C.S.A. § 5323(a).

Here, the trial court found that Factors 1, 8, and 13 weighed in Mother's favor.   The trial court further determined that Factors 3, 10, 11, and 12 weighed in favor of neither party and that Factors 2, 2.1, 14, and 15 were inapplicable.   With respect to Factor 4, which is the need for stability and continuity in the child's education, family life, and community life, the trial court determined that the factor was "relatively neutral," noting that:

> C.P. views his parents as a source of strength and stability in his education and family life.  Both Father and Mother are employed and provide a home for their family.   C.P. attends church with his mother.   He confides in and trusts both parents to support him. C.P. has friends in both communities.
>
> C.P. has a strong sense of family that is attributed to his parents.   C.P. has a good relationship with [S]tep-[M]other.   C.P. is especially bonded with his [S]tep-[F]ather. Testimony revealed Step-Father has involvement in C.P.'s life with coaching football, transportation, weightlifting, and teaching him about real estate ventures.  Step-Father has demonstrated an ability to remain neutral and respectful in this case.

Trial court opinion, 7/19/19 at 13.

The trial court further determined that Factor 5, which is the availability of extended family, was relatively neutral, noting that C.P.'s extended family predominantly resides in Beaver County, but that C.P. remains close with his paternal and maternal relatives.  (*Id.* at 13-14.)

- 13 -

The trial court also found Factor 6, which is the child's sibling relationships, to be relatively neutral, noting that

> C.P. has half-siblings in both parties' households with whom he has good relationships. Additionally, C.P. has a step-sibling at Father's home with whom he has a good relationship even though they are not close, predominantly due to the difference in their ages.
>
> While brothers, C.P. and B.P., are close, they have different interests and groups of friends. The current custody schedule is different for both [C]hildren and it has not negatively impacted their relationship. C.P. and B.P. have continued to see each other and have had the ability to foster their relationship. They both agree that having the same schedule is irrelevant to them. Th[e trial c]ourt is confident that these siblings will continue to foster their relationship.

*Id.* at 14.

With respect to Factor 7, which is the well-reasoned preference of the child, the trial court found this factor to be neutral, but noted that its consideration of this factor provided guidance. The trial court opined:

> As described by witnesses and seen by th[e trial c]ourt, C.P. is a mature, polite, honest, and adaptable minor who loves both of his parents. He has, through these proceedings, become more and more guarded in his comments. He has a great relationship with [F]ather and does not have a bad relationship with [S]tep-[M]other. He has a really good relationship with [M]other and a good relationship with [S]tep-[F]ather. C.P. was clear that he does not want to be involved in Court litigation and hopes he does not have to be interviewed again. C.P. has agreed to follow whatever the [trial c]ourt directs.
>
> The [trial c]ourt is concerned that C.P. is feeling pressure placed upon him by Father. The GAL expressed concern with the pressure C.P. is feeling.

Testimony and argument revealed Father questioning what C.P. had said to the [trial c]ourt and the GAL. Father has tried to explain how to interpret differently what C.P. has said because Father believed C.P. could not have expressed a positive statement about [M]other or Beaver Area.

It is noted that the GAL is supportive of a change in the custody schedule and school district for C.P. The GAL indicated in her Report to [the trial c]ourt that C.P. had expressed a willingness to spend more time at Mother's home in the Beaver area with a change in school districts. The GAL testified that after either hearing or seeing what the GAL wrote in her report about spending more time at Mother's home and changing schools, C.P. called the GAL while in Father's custody and back-peddled [sic], saying that was not what he meant. The [trial c]ourt hears that C.P. may have made, to th[e trial c]ourt and the GAL, inadvertent positive statements about Beaver, along with a lack of enthusiasm and acknowledgement of influences about Upper St. Clair then became pressured to recant what he said.

The [trial c]ourt knows that C.P. does not want to hurt either parent in any way and loves them both. The parties need to recognize C.P.'s love for both parents. They should not put him in the middle, and should not fault him, criticize him, or question him about the statements he has made in these proceedings. Both parents should support C.P. in his studies and endeavors.

C.P.'s position, at this point, is that it is not about the school, as that does not matter where he attends, he will do fine; it is about seeing both parents. C.P. does not want his parents to worry about a check and balance system of time, as he loves them both equally. C.P. just wants this custody action done.

*Id.* at 14-15.

The trial court determined that Factor 9, which is which party is more likely to maintain a loving, stable, consistent, and nurturing relationship with child adequate for child's emotional needs, slightly favors Mother. The trial court explained that

> [b]oth parties maintain loving, stable, consistent, and nurturing relationships in their respective homes, which are accommodating for their families to support the adequate needs of C.P.
>
> Father's inappropriate handling of the custody of B.P., in which Father's behavior in failing to follow the Court Order had a negative impact on B.P.'s relationship with [M]other, does not adequately provide for the minor's emotional needs. The pressure Father has exerted upon the [C]hildren does not adequately support their emotional needs. The [trial c]ourt cautions Father so that similar circumstances do not resurface.

*Id.* at 16.

With respect to Factor 16, which permits the trial court to consider any other factor that it deems relevant, the trial court first set forth a comparison of Upper St. Clair School District and Beaver Area School District and found both institutions "impressive and largely comparable" with respect to scholastic offerings, rankings, extracurricular programs, such as football, which C.P. is "passionate" about.[1] (*Id.* at 18-19.) The trial court then found the following relevant:

> The [trial c]ourt spent hours reviewing the parties' exhibits and submitted written communications. The

---

[1] We note that the record reflects that at the time of trial, C.P. had completed 8th grade and was preparing to enter high school.

communications presented were only partial emails, text messages, or snapshots as to issues that needed resolved. These snapshots depicted many contentious dialogues, derogatory verbiage, and an unwillingness to communicate to resolve issues.

It is noted that attached to the Emergency Petition filed by Mother, three (3) weeks after the conclusion of Trial, was a communication to Mother by Father in which he continued to use profanity in referring to Mother, as well as suggesting she is exposing C.P. to evil while in her custody. Father's continual degrading tone in his communications, as well as his refusal to support C.P. in attending his mandatory practices, was disheartening to the [trial c]ourt and contrary to a supportive transition for C.P. into his new school district.

It is further noted that on August 15, 2019, an Emergency Motion for Reconsideration of the [trial c]ourt's July 31, 2019 Order was filed by Father. During argument by his counsel, there were continual claims that what C.P. had said was not really what he meant. Th[e trial c]ourt is concerned that Father is continuing to assert pressure on C.P. The GAL, at this Motion, expressed C.P. was doing well.

*Id.* at 19-20.

Father first claims that the trial court erred in modifying the custody order because, pursuant to the family unity doctrine, no compelling reason existed to separate C.P. and B.P.

[T]he policy in Pennsylvania is to permit siblings to be raised together, whenever possible (the doctrine of "family unity" or "whole family doctrine"). Absent compelling reasons to separate siblings, they should be reared in the same household to permit the "continuity and stability necessary for a young child's development." This policy does not distinguish between half-siblings and siblings who share both biological parents. However, this Court has made

- 17 -

> clear that the policy against separation of siblings is only one factor-and not a controlling factor-in the ultimate custody decision. In the majority of cases in which this doctrine has been invoked, the children have been reared together prior to separation or divorce of the parents. In cases where the siblings have not been reared in the same household, the force of the doctrine is less compelling.

***Johns v. Cioci***, 865 A.2d 932, 942-943 (Pa.Super. 2004) (internal citations omitted).

Father claims that the trial court "alleged" that compelling reasons existed but "offered no such reasons." (Father's brief at 26.) Father is mistaken.

In its August 23, 2019 opinion, the trial court concluded that:

> B.P. and C.P. are intelligent and polite young men who clearly love both their parents. Both parties provide the [C]hildren with love, support, and affection. Both parties have been significant caregivers. Both parties have been loving and caring parents who have the best interests of the [C]hildren at heart, as they each see it. Both [Children] have great potential and need the guidance and support of both parents to achieve their full capacity.
>
> A policy consideration is to raise siblings together, but compelling interests may warrant a separation of two (2) siblings. The siblings in this case already have different schedules. The [C]hildren have maintained a good relationship and bond with one another, regardless of their different schedules, their age difference, and their different interests.
>
> Both parties love their [C]hildren. However, [the trial c]ourt is concerned that Father's hostility and negativity towards Mother has already helped to alienate [B.P.] from Mother. Father's actions and lack of encouragement of a relationship between B.P. and

> Mother demonstrate disrespect for Mother's relationship with [C]hildren.
>
> The [trial c]ourt is not addressing B.P. in this Opinion as it relates to the custody factors and school district, as an agreement concerning custody as it pertains to him has been previously agreed upon and was presented as part of the Proposed Order. B.P. is seventeen (17) years of age and will tum eighteen (18) in only a few months. He has over the months begun to mend his relationship with [M]other. Th[e trial c]ourt hopes that Father will be supportive of that relationship with Mother and encourage it.
>
> The [trial c]ourt finds Mother is more likely to encourage, permit, and ensure frequent contact between C.P. and Father. Mother has not spoken ill of Father to the [C]hildren and has been supportive of their relationship with Father. The [trial c]ourt is hopeful that Father will be supportive of C.P. and learn to communicate with Mother so, together[,] they can show their support for C.P. This Order will ensure contact with both parties for C.P. to grow and continue to flourish into the bright young man he desires to be.

Trial court opinion, 8/23/19 at 20-21.

Additionally, in its Rule 1925(b) opinion, the trial court relied on this court's decision in **_L.F.F. v. P.R.F._**, 828 A.2d 1148 (Pa.Super. 2003), as factually and legally analogous. In **_L.F.F._**, this court affirmed the custody order that resulted in sibling separation after determining that the record supported the trial court's conclusion that father's severe animosity toward mother and its potential to result in one child's alienation from mother if father was awarded primary physical custody of that child constituted a compelling reason to separate that child from his sibling. **_Id._** at 1154.

Here, our review of the record, which included the trial transcripts and exhibits of electronic communications from Father to Mother, as well as the GAL reports, supports the trial court's conclusion that Father's hostility and negativity toward Mother, as well as his demonstrated disrespect for Mother's relationship with her Children, creates the potential that C.P. may become alienated from Mother and, therefore, constitutes a compelling reason to separate the Children.

Father next claims that the trial court's "justification" to separate the Children was not supported by the record and was, therefore, not "compelling." (Father's brief at 28.) Although our disposition of Father's first issue also disposes of this issue, we note that Father's argument on this issue does nothing more than set forth select testimony in an effort to persuade us to reach a different result. It is well settled that this court cannot reverse a trial court's decision merely because the record could support a different result. *See In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003). When we review a custody order, "the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record." *P.J.P.*, 185 A.3d at 417. Our thorough review of the record in this case demonstrates that competent record evidence supports the trial court's factual findings and its modified custody order is reasonable in light of those findings.

Father finally complains that the trial court erred in modifying the custody order in a manner that significantly decreased Father's custodial time with C.P.

At the outset, we note that Father mistakenly asserts that the August 23, 2019 custody order awarded Mother primary physical custody of C.P. and awarded Father partial physical custody. Father is mistaken. The custody order did not change the form of custody. The custody order retained the shared physical custody of C.P. that Mother and Father have always enjoyed, but modified the custody schedule after the trial court determined doing so would be in C.P.'s best interest.

That being said, in Father's argument on this issue, Father highlights select portions of the trial court's August 23, 2019 opinion, as well as select testimony, in an effort to, once again, persuade us to reach a different result. Once again, however, "the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record." **P.J.P.**, 185 A.3d at 417. And once again, we find that competent record evidence supports the trial court's factual findings, and its modified custody order is reasonable in light of those findings.

Order affirmed.

J. A02042/20

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/14/2020