J-A06008-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF N.N.S.L. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: H.B.L. | : | |
| | : | |
| | : | No. 1061 WDA 2020 |

Appeal from the Order Entered September 25, 2020
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  156 of 2018

BEFORE:  BENDER, P.J.E., LAZARUS, J., and McCAFFERY, J.

MEMORANDUM BY BENDER, P.J.E.:                **FILED: APRIL 5, 2021**

H.B.L. (Father) appeals from the order, dated September 1, 2020, and from the amendment to that order, dated September 3, 2020, that involuntarily terminated Father's parental rights to N.N.S.L. (Child), born in August of 2014.[1]  The orders were entered on the trial court docket on September 25, 2020.[2]  Following our review, we affirm.

On appeal, Father's brief provides the following question for our review:

---

[1] The September 3, 2020 order simply amends the September 1, 2020 order that terminated the parental rights of Father and R.J.H. (Mother) by vacating the paragraph giving custody of Child to foster parents and awarding custody of Child to the Westmoreland County Children's Bureau (Agency).

[2] As noted in footnote 1, Mother's parental rights were terminated at the same time that Father's parental rights were terminated.  Mother did not appeal that determination and is not a party to this appeal.

Whether the trial court erred in finding by clear and convincing evidence that the Westmoreland County Children's Bureau met its burden[] under 23 Pa.C.S. § 2511(b)?

Father's brief at 4.

We review an order terminating parental rights in accordance with the following standard:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). The burden is upon the petitioner to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276. Moreover, we have explained that:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If

competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003).

We have reviewed the certified record, the briefs of the parties, the applicable law, and the comprehensive Order of Termination authored by the Honorable Jim Silvis of the Court of Common Pleas of Westmoreland County, dated September 1, 2020.[3] We conclude that Judge Silvis's well-reasoned decision properly disposes of the issue raised by Father. In particular, Judge Silvis noted that, "while Father loves his Child, the Child does not have a healthy attachment to her Father, and therefore there is no beneficial relationship that should be preserved at the expense of the security and stability offered by the pre-adoptive parents." Order of Termination, 9/1/2020, at 9 (¶ 32). The judge further found that when Child had not seen Father for months, there were no adverse consequences; rather, she "calls her foster parents 'Mom' and 'Dad,' and looks forward to the day when they can adopt her." *Id.* Judge Silvis concluded that the termination of Father's parental rights would not significantly impact Child and that the termination would best serve Child's needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 269 (Pa. 2013) (stating that in cases dealing with termination of parental

---

[3] The order issued pursuant to Pa.R.A.P 1925(a) on October 20, 2020, explains that the trial court's rationale for ordering the termination of Father's parental rights is contained in the September 1, 2020 order.

- 3 -

rights, the law should be applied "with an eye to the best interests and the needs and welfare of the particular children involved"). Thus, we conclude that Judge Silvis's Order of Termination properly disposes of the issue Father raises in this appeal. Accordingly, we adopt Judge Silvis's Order of Termination in lieu of an opinion as our own and affirm the decision appealed from on that basis.

Order of Termination affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/5/2021

# IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, COMMONWEALTH OF PENNSYLVANIA

## ORPHANS' COURT DIVISION

IN RE:             )
ADOPTION OF        )
                        )     Case No. 156 of 2018
NEVAEH NICOLE SKY LOVE    )
(D.O.B. August 2, 2014)      )

SEP 01 2020

## ORDER OF TERMINATION
(Involuntary Termination)

AND NOW, this 1st day of September, 2020, after a review of the record and the applicable law, and following a hearing on August 27, 2020, on Petitions for Involuntary Termination of Parental Rights filed on December 11, 2019, by Petitioner, Westmoreland County Children's Bureau, under 23 Pa.C.S.A. §2511(a)(8) and § 2511(b) regarding Robin Joan Hrin, Birth Mother, and Hugh Bernard Love, Birth Father, to the minor child, Nevaeh Nicole Sky Love, born August 2, 2014, the Court finds as follows:

1. Involuntary termination of parental rights may be granted when "[t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child."[1]

---

[1] 23 Pa.C.S. §2511(a)(8).



EXHIBIT
"A"

1

2. "With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition."[2]

3. 23 Pa.C.S. § 2511(b) is interpreted to require evaluation of the emotional bond, if any, between the parent and child, as a factor in the child's development.[3] Assuming such a bond exists, the same must indicate a beneficial relationship, which should be preserved.[4]

4. The present Petitions for Involuntary Termination of Parental Rights, which seek to terminate the parental rights of the biological father and mother, were filed on December 11, 2019.

5. Birth Mother is Robin Joan Hrin (hereinafter "Mother"). Her maiden name was Robin Joan Hrin. She was born August 5, 1989, and is presently 31 years old.

6. Birth Father is Hugh Bernard Love (hereinafter "Father"). He was born July 16, 1976, and is presently 44 years old. He is named as the father on the Child's birth certificate. On November 13, 2015, a paternity test confirmed him as the father of the Child.

7. The minor child, Neveah Nicole Sky Love, was born on August 2, 2014. She is presently 6 years old.

8. The Petitioner is the Westmoreland County Children's Bureau (hereinafter "WCCB"), represented by Debra Nicholson, Esq., during the termination proceeding.

9. Neither Birth Mother nor Birth Father appeared at the involuntary termination of parental rights hearing held on August 27, 2020, however Mother's legal counsel, Shirley Makuta, Esq., and Father's legal counsel, Eric Dee, Esq., were present on each one's behalf.

---

[2] 23 Pa.C.S. §2511(b).
[3] *In the Matter of K.K.R.-S.*, 958 A.2d 529 (Pa. Super. 2008).
[4] *In re C.L.G.*, 956 A.2d 999 (Pa. Super. 2008).

2

10. Attorney Dee and Attorney Makuta each stated their clients had not contacted them or responded to their attempts to reach them prior to the scheduled hearing.

11. The Child's Guardian *ad litem*, Rochelle Bosack, Esq., appeared at the hearing on the Child's behalf. The Child's attorney, Ashley Lovelace, Esq., appeared at the hearing on the Child's behalf.

12. A brief procedural history of the case is as follows: The WCCB filed a dependency petition concerning the Child due to concerns about Parents' drug use. An Adjudication and Disposition Hearing was held on September 29, 2015, after which the court found the Child to be dependent, but allowed the Child to remain in the physical custody of her Parents contingent upon their compliance with conditions contained in the Order. On October 7, 2015, the court granted emergency custody of the Child to the WCCB as a result of Parents' ongoing drug use and failure to comply with the conditions in the previous court Order. At the conclusion of a Shelter Care hearing held on October 13, 2015, the Child was placed in foster care.

13. The Child has been in foster care for almost five (5) years.

14. During the period of the Child's dependency, periodic permanency review hearings were held with Adjudication and Review Orders entered on the following dates: September 29, 2015; October 13, 2015; March 21, 2016; September 7, 2016; March 6, 2017; September 27, 2017; March 7, 2018; October 12, 2018; April 3, 2019; October 2, 2019; and May 6, 2020. See WCCB Ex. 7, Orders filed at Juvenile Court docket number CP-65-DP-144-2015.

15. Father has a criminal record relating to possession of controlled substances. Mother has a more extensive criminal record including charges of theft, receiving stolen property, and

3

possession of controlled substances, among other things, including outstanding criminal charges that are awaiting disposition. See WCCB Ex. 1.

16. Robert Gurecka of Arc Point Labs of Pittsburgh North, Pittsburgh, PA, testified with regard to the attempts made to drug test both Mother and Father, and the results of his efforts. With regard to Mother, Mother failed to contact them after they made multiple attempts to reach her. When she was recently tested in June 2020, she was positive for methamphetamines. With regard to Father, since October 2019, he tested positive for many substances for which he had no prescription, and the last test he took was in March 2020. Since then, he has not responded to the agency's attempts to reach him nor has he had any tests. See WCCB Ex. 3, which are the monthly reports of Arc Point Labs pertaining to Mother and Father.

17. Erin Conrad, M.A., a Program Supervisor with Merakey Behavioral Health, McMurray, PA, placed the Child in her current pre-adoptive foster home. She has provided once a week individual counseling for the Child since May 2019. Ms. Conrad stated the Child's behavior – physical and verbal aggression, and non-compliance – has improved. The Child "seems bonded" with the Foster Parents; she refers to them as "Mom" and "Dad" and talks about being adopted with excitement and anticipation. Ms. Conrad's opinion is that the Child should be adopted by her current pre-adoptive parents who have an understanding of the Child's behavioral issues.

18. Eamon Galvin, M.S.Ed., a therapist with Moving Forward 15601, LLC, Greensburg, PA, and an expert in supervised visitation, was referred this family on June 15, 2018. Mother attended about one-third of the offered visits with the Child, and the last visit was over a year-and-a-half ago in January 2019. Father's visits with the Child were inconsistent, and

4

Father candidly admitted his drug use interfered with regularly seeing his Child; he attended 29 of 60 offered visits. See WCCB Ex. 4, Reports issued by Moving Forward 15601, LLC regarding Parents' visits with the Child.

19. Megan Schweppe, M.A., a therapist with King and Associates, Inc., Greensburg, PA, is qualified as an expert in trauma therapy for children. She began treatment with the Child in March 2018. As of the day of the hearing, they have had 67 sessions. Ms. Schweppe explained the Child has significant anxiety, as she does not know where she belongs yet, having been in foster care for 5 years. Not knowing where her permanent home will be is a significant source of anxiety and it has interfered with her healing. After a visit with her Father, the Child exhibits significant disregulation, throwing things and unable to control herself. The Child has improved since being in the pre-adoptive foster home; she has referred to her foster parents as "Mom" and "Dad" since October 2019, and wants to change her last name to theirs. Another child in the household was recently adopted by the foster parents, so the Child is knowledgeable about the process and desires to be adopted by them too. Ms. Schweppe's opinion is that it is in the best interests of the Child to be adopted by her pre-adoptive foster parents.

20. Clarissa Coughanour, a counselor with Family Care for Children and Youth, Greensburg, PA, was asked to provide help to Father and Mother in obtaining housing and employment. Mother began receiving services in July 2018; in September 2019, she was discharged from the program for non-compliance. Father began receiving services in October 2018, but then discontinued in June 2020, saying he no longer wanted services. See WCCB Ex. 6, Reports issued by Family Care for Children and Youth.

21. Neal Rosenblum, Ph.D., a licensed clinical psychologist in Pittsburgh, PA, is qualified as an expert in interactional psychological evaluations. He evaluated the Child, the Foster Family, and the Parents, and reported as follows. During the first evaluation in June 2019, Father was sincere, caring and loving, but had a long history of compromised behavior involving drug use and criminal activity. Father did not try to minimize or hide his problems, but tried to focus on his treatment. Father interacted nicely with the Child and made a positive effort. There was evidence of a relationship and an attachment, but it was abnormal because the Child uses people as a means to an end. However, six months later, at the time of the second evaluation in January 2020, Father had relapsed, entered an in-patient program, and expressed feelings of guilt, self-criticism and depression. At that time, he was in his fourth period of rehabilitation. In addition, the Child was beginning to demonstrate emotional connection with her foster parents. She started calling them "Mommy" and "Daddy," and said she was hoping to be adopted and have them as her "forever family." She responded well to their continuity of care, which includes 2 older daughters in the family.

22. Dr. Rosenblum opined that "time's up." The Child cannot indefinitely remain in limbo, especially with the diagnosis of attachment disorder. She needs to remain in a stable and secure home, a home that Father is incapable of providing due to his repeated cycle of drug abuse. Father's relationship with the Child is helpful, and Father deserves credit for trying when he's able, but he is not in a position to take care of the Child. In addition, Rosenblum noted that the Child has gone several months without seeing her Father and it does not appear to have made any negative impact upon her.

6

23. Dr. Rosenblum had no contact with Mother; she did not attend the July 19, 2019, evaluation. The Child mentioned her Mother to Dr. Rosenblum, but stated, "She's not my mother anymore."

24. 24. Dr. Rosenblum was glad that Father was given a chance with the follow-up evaluation in January 2020, but in his opinion, within a reasonable degree of psychological certainty, the developmental and emotional needs of the Child would be best served by her remaining permanently where she is. See WCCB Ex. 2, Evaluation Reports of Dr. Rosenblum.

25. Rebecca Walker, caseworker for WCCB, testified about the multiple times Mother sought and failed to successfully complete drug treatment services. Mother has not had mental health treatment. She does not have stable housing. She does not have income. Likewise, Father has been in-and-out of treatment, in-and-out of halfway houses, and in-and-out of periods of sobriety. He lives with his girlfriend, but has no verifiable source of income. The agency previously provided transportation to Father through Justice Works, but Father's services were recently terminated due to his non-compliance. Father and Child began interactional therapy with Richelle O'Malley, M.S.Ed., a therapist at Project STAR, but when Father was non-compliant, the therapy was terminated. The last contact Ms. Walker had with Mother was on May 21, 2020, when termination was discussed; Mother said she would speak to her attorney about termination, but she never called back. The last contact Ms. Walker had with Father was on June 18, 2020.

26. Ms. Walker recommends that Parents' parental rights be terminated. The reasons for the removal of the Child from her home – substance abuse, lack of housing and income – have persisted for 5 years with the Parents engaged in a repetitive cycle. The pre-adoptive

7

parents, with whom the Child has lived for the last 15 months, have been able to manage the Child's behavioral issues. They are meeting her needs and dedicated to her continuing in therapy. The Child feels safe in their home and does not want to leave this stable and secure environment.

27. The Child's Guardian *ad litem* and attorney both recommend termination as being in the best interests of the Child.

28. Based on the above findings of fact, it is apparent that the Child has been removed from the care of the parents by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the Child continue to exist and termination of parental rights would best serve the needs and welfare of the Child.

29. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court will not consider any efforts by the Father or Mother to remedy the conditions described therein which were first initiated subsequent to the giving of notice of the filing of the petition.[5]

30. "The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent."[6] This decision is made, not solely on the basis of environmental factors including financial and housing circumstances, but upon the facts

---

[5] *Id.*
[6] 23 Pa.C.S.A. § 2511(b).

8

enumerated above indicating that the circumstances which led to the Petitions for Involuntary Termination were entirely within Birth Father's and Birth Mother's control, pursuant to 23 Pa.C.S.A. § 2511(b).

31. 23 Pa.C.S. § 2511(b) is interpreted to require evaluation of the emotional bond, if any, between the parent and child, as a factor in the child's development.[7] Assuming such a bond exists, the same must indicate a beneficial relationship, which should be preserved.[8]

32. Based upon the above findings of fact, while Father loves his Child, the Child does not have a healthy attachment to her Father, and therefore there is no beneficial relationship that should be preserved at the expense of the security and stability offered by the pre-adoptive parents. As previously stated, the Child has gone for months without seeing Father and there appear to have been no adverse consequences. The Child dismisses her Mother as someone who is not her mother anymore; the Child has no attachment to her Mother. On the other hand, the Child calls her foster parents "Mom" and "Dad," and looks forward to the day when they can adopt her. The Child's emotional attachment is primarily to her foster parents. Based upon the above findings of fact, to the extent there is a bond between Father and the Child, it does not benefit the Child to prevent her from being able to be adopted by the foster parents.

33. It is in the best interest of the Child, developmentally, physically, and emotionally, for the rights of Birth Father to be terminated, pursuant to 23 Pa.C.S.A. § 2511(b), as she is currently well cared for, both physically and emotionally, by her pre-adoptive foster father and mother, parents with whom she has a healthy relationship, structure and a strong familial bond.

---

[7] *In the Matter of K.K.R.-S.*, 958 A.2d 529 (Pa. Super. 2008).
[8] *In re C.L.G.*, 956 A.2d 999 (Pa. Super. 2008).

34. It is in the best interest of the Child, developmentally, physically, and emotionally, for the rights of Birth Mother to be terminated, pursuant to 23 Pa.C.S.A. § 2511(b), as she is currently well cared for, both physically and emotionally, by her pre-adoptive foster father and mother, parents with whom she has a healthy relationship, structure and a strong familial bond.

It is therefore hereby **ORDERED, ADJUDGED and DECREED** that the Petition for Involuntary Termination of Birth Father Hugh Bernard Love's Parental Rights is **GRANTED**. ALL OF THE BIRTH FATHER'S PARENTAL RIGHTS TO THE MINOR CHILD ARE HEREBY FOREVER TERMINATED AND THE CHILD MAY BE ADOPTED WITHOUT FURTHER CONSENT OF, OR NOTICE TO, SAID BIRTH FATHER.

It is therefore hereby **ORDERED, ADJUDGED and DECREED** that the Petition for Involuntary Termination of Birth Mother Robin Joan Hrin's Parental Rights is **GRANTED**. ALL OF THE BIRTH MOTHER'S PARENTAL RIGHTS TO THE MINOR CHILD ARE HEREBY FOREVER TERMINATED AND THE CHILD MAY BE ADOPTED WITHOUT FURTHER CONSENT OF, OR NOTICE TO, SAID BIRTH MOTHER.

The custody of Neveah Nicole Sky Love is hereby given to Jason Ligenfield and Deidre Ligenfield.

The Petitioner is **DIRECTED** to file the Petition for Adoption within sixty (60) days after the conclusion of the appeal period.

FURTHER, in accordance with Pa.O.C.R. No. 4.6(b), the Clerk of the Orphan's Court is **DIRECTED** to note in the docket that the individuals listed below have been given notice of this Order.

BY THE COURT:

_____, J.
JIM SILVIS, JUDGE

ATTEST:

_____
Clerk of the Orphan's Court

Cc:    Debra Nicholson, Esq., Attorney for Petitioner
       Eric Dee, Esq., Attorney for Birth Father
       Shirley Makuta, Esq., Attorney for Birth Mother
       Rochelle Bosack, Esq., Guardian *ad litem*
       Ashley Lovelace, Esq., Attorney for the Child
       Carol Petrusky, Deputy Court Administrator

11