J-A25010-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF J.C.S., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.W.P., FATHER | : : : : : : : : | |
| | : | No. 555 WDA 2023 |

Appeal from the Order Entered April 10, 2023
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  No. 6 of 2019

BEFORE:   BOWES, J., KUNSELMAN, J., and COLINS, J.*

MEMORANDUM BY BOWES, J.:                    **FILED: JANUARY 30, 2024**

L.W.P. ("Father") appeals from the order terminating his parental rights to his child, J.C.S., born in November 2017.  We affirm.

We glean the following from the certified record.  T.S. ("Mother") gave birth to J.C.S. while she was incarcerated.  She was not married to Father and did not identify him as the father of J.C.S.  Since Mother had to return to jail and paternity had not been established, the Westmoreland County Children's Bureau ("WCCB") sought and was granted emergency protective custody of J.C.S.  He was ultimately adjudicated dependent and placed in foster care.[1]

On March 6, 2018, Father's paternity was finally established, but Father notified WCCB that he was not interested in reunification.  During the ensuing

---

* Retired Senior Judge assigned to the Superior Court.

[1] J.C.S. has remained in the same pre-adoptive foster home since his birth.

year, Mother failed to progress sufficiently with her goals, and on February 27, 2019, WCCB filed petitions to terminate the parental rights of Mother and Father.

Thereafter, Father changed his mind and indicated a desire to reunify with J.C.S. Father met J.C.S. for the first time on April 17, 2019, when he was approximately seventeen months old. WCCB agreed to a continuance of the termination proceedings to allow Father the opportunity to meaningfully engage in reunification services. In accordance with that plan, Father continued to have supervised visits with J.C.S., Father's home was deemed appropriate, and he had secure employment. WCCB determined that it had no drug, alcohol, or mental health concerns for Father. Nonetheless, WCCB had reservations about the prospects of reunification because Father did not fully grasp Mother's instability and how her mental health issues could affect J.C.S. Critically, Father disobeyed court orders by allowing Mother to have contact with J.C.S. during his visits and would become angry when he was advised that such conduct was not permitted. Throughout the ensuing review periods, Father's "main deficiency was his continuous relationship with Mother." Orphans' Court Opinion, 4/10/23, at 10. While "Father recognized that Mother's behavior was problematic for [J.C.S., he] was steadfast that Mother should remain in the child's life." *Id*. at 12 (cleaned up). On March 31, 2021, WCCB filed an amended petition to terminate Father's parental rights.

The orphans' court held nine hearings over a period of sixteen months on the petitions to terminate the parental rights of Mother and Father.[2] Over the course of the hearings, the court heard testimony from numerous witnesses, including Dr. Neil Rosenblum, Dr. Aaron Keteles, and Father.

Dr. Rosenblum conducted interactional evaluations of J.C.S. and his foster parents in January and September 2020, and of J.C.S. and Father in

_____

[2] Father appeared without counsel at the first hearing on October 7, 2021. Therefore, the proceedings that day concerned only Mother, and the case against Father began on December 2, 2021, by which time Father had secured counsel.

Additionally, J.C.S. was represented at the hearings by Brett E. Fullem, Esquire, as legal counsel and Rochelle L. Bosack, Esquire, as guardian *ad litem* ("GAL"). We note that legal counsel declined to file a brief in this Court because of J.C.S.'s age. Meanwhile, the GAL submitted a brief on J.C.S.'s behalf, asking us to reverse the termination order because of the bond between Father and J.C.S. Additionally, the GAL argued, without elaboration, that "termination would sever his connection to his natural family's heritage and culture as well as his relationships with his half-siblings and full sibling." GAL's brief at 10-11. In making this argument, the GAL does not address J.C.S.'s bond with his foster family. Moreover, we note that Father does not raise the issue of his cultural heritage or the relationship J.C.S. purportedly shares with Father's other children in support of his argument against termination.

Finally, it bears mentioning that these proceedings have languished for an unreasonable amount of time. In that regard, the orphans' court acknowledged "the unacceptable amount of time it took to conclude the hearing on the [t]ermination [p]etition[,]" which "unnecessarily delayed permanency for [J.C.S.]." Orphans' Court Opinion, 4/10/23, at 74. Nonetheless, the court credited WCCB with offering services to Father, at his request, before re-filing the termination petition. *Id*. at 74 n.1. For our part, this Court regrettably had to delay disposition further to secure transcription of some of the termination hearings.

January 2020. He testified regarding the bond attachments J.C.S. had with respect to his foster parents and Father.

Dr. Keteles began supervising Father's visits with J.C.S. in April 2022, after Father had impermissibly allowed Mother to call J.C.S. during his monitored visits. He provided testimony regarding the appropriateness of the visits and Father's interactions with J.C.S. Of relevance to the bond between J.C.S. and Father, Dr. Keteles observed that J.C.S. is comfortable with Father during visits and that he occasionally displays spontaneous affection towards Father.

Father attested over the course of the last two termination hearings regarding, *inter alia*, his initial lack of involvement with J.C.S. He explained that although he had signed paperwork to voluntarily terminate his parental rights because he believed that doing so meant he was relinquishing his parental rights to Mother, he revoked his signature once he learned that Mother was not compliant with her WCCB services. Father described his visits with J.C.S. and challenged the efficacy of Dr. Rosenblum's assessment because his evaluation occurred after that with the foster parents. Finally, Father expressed his belief that Mother was ready to be reunified with J.C.S.

Following the hearing, the orphans' court entered an order terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (8), and (b). This timely appeal followed. Father complied with Pa.R.A.P. 1925, and the orphans' court directed us to its April 10, 2023 opinion for the reasoning in support of the termination order. Father presents a single issue for our

review: "Whether the trial court erred in finding by clear and convincing evidence that the [WCCB] met its burden, under 23 Pa.C.S. § 2511(b)?" Father's brief at 4.

We begin with our well-settled standard of review.

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358–59 (Pa. 2021) (cleaned up). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In*

*re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (cleaned up).

Termination is proper when the moving party proves grounds for termination under any subsection of § 2511(a), as well as § 2511(b). *In re Adoption of T.B.B.*, *supra* at 395. Father does not contest that WCCB met its burden pursuant to § 2511(a). Accordingly, we only look at § 2511(b), which provides as follows:

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

Of note, we "should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent." ***In the Interest of K.T.***, 296 A.3d 1085, 1105 (Pa. 2023) (cleaned up). Moreover, this analysis "should not be applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." ***Id***. at 1105-06 (cleaned up). Thus, there is no "exhaustive list" of factors that must be considered. ***Id***. at 1113 n.28. While the particular facts of each case dictates the factors to be considered, our precedent indicates that relevant points of inquiry include "intangibles such as love, comfort, security, and stability." ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (cleaned up).

Our Supreme Court has mandated, however, that an evaluation pursuant to § 2511(b) should consider the child's bond with his or her parent. ***See In re E.M.***, 620 A.2d 481, 485 (Pa. 1993). Specifically, we must render "a determination of whether the bond is necessary and beneficial to the child[.]" ***In the Interest of K.T.***, ***supra*** at 1113. This evaluation involves

consideration of the effect of severing the child's bond with their parent. *Id*. at 1109. In termination matters, "severance of a necessary and beneficial relationship is the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." *Id*. at 1109-10 (quoting *In re E.M.*, *supra* at 484). Our Supreme Court has distinguished, however, "extreme emotional consequences" from a mere "adverse or detrimental impact" in the termination context. *Id*. at 1111. Specifically, the High Court has cautioned that Pennsylvania courts "must not truncate [their] analysis and preclude severance based solely on evidence of an adverse or detrimental impact to the child." *Id*. at 1114 (cleaned up).

Furthermore, "courts must not only consider the child's bond with the biological parent, but also examine the intangibles such as the love, comfort, security, and stability the child might have with the **foster** parent." *Id*. at 1111 (emphasis in original; cleaned up). Thus, we consider factors that arise from the facts of each case, such as the child's need for permanency and length of time in foster care, whether the child is bonded with the foster parents, and whether the foster home meets the child's needs. *Id*. at 1113. Overall, "bond, plus permanency, stability and all intangible factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of primary importance in the [§] 2511(b) analysis." *Id*. at 1109 (cleaned up).

In weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." *In re T.S.M.*, 71 A.3d

251, 269 (Pa. 2013). "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*. A court cannot "toll the well-being and permanency" of a child indefinitely in the hope that a parent "will summon the ability to handle the responsibilities of parenting." *In re C.L.G.*, 956 A.2d 999, 1007 (Pa.Super. 2008) (*en banc*) (citation omitted).

Father maintains that the evidence established he had a bond with J.C.S., and that his visits were "positive and appropriate." Father's brief at 14. In support of his argument, he highlights the types of activities he engaged in with J.C.S. during visits. *Id*. at 15-16. Relying solely on the existence of this bond, Father concludes that "it is also clear that terminating Father's parental rights would destroy a necessary and beneficial relationship for [J.C.S.]" *Id*. at 15.

It appears that there is no dispute that J.C.S. and Father share a positive relationship that has continued to develop over the course of their visits. The orphans' court acknowledged the bond between Father and J.C.S., but nevertheless determined that given the particular circumstances of the case, termination was proper under § 2511(b):

> While [J.C.S.] has consistently visited with Father, he has never lived with Father or stayed overnight at Father's residence[,] which would allow the child to build a primary attachment to Father. The foster parents have consistently and regularly provided for the child's daily needs since his birth. As per Dr. Rosenblum's testimony, the child feels the most secure with foster

parents and removing him from that home would be a traumatic event for the child that would likely cause regression in his development. . . .

. . . When [J.C.S.] calls his foster parents "Mom" or "Dad," he is corrected by either Mother or Father. Dr. Keteles overheard Father tell [J.C.S.] that he only has one mother and one father. Father has indicated that he would continue to correct [J.C.S.] if he said that he had two moms and two dads[.] . . .

While Father has made continuous efforts towards reunification and clearly possesses appropriate parenting skills, the needs and welfare of the minor child support termination of Father's parental rights. Father has not demonstrated the ability to keep the child away from Mother, even after hearing the WCCB's various concerns for Mother's mental health and the court orders which direct Mother's visitation to be fully supervised. Father was adamant that he wanted Mother to be reunified with the child despite the fact that this desire is not currently in the best interests of the child. On August 24, 2022, Father told the caseworker that he would allow Mother to be around the child unsupervised if she was "sober-minded," even though Father had heard numerous days of testimony in which service providers indicated that Mother's parental deficits were not limited to her sobriety. . . .

. . . Father also testified that he believes Mother's mental health issues are a result of the WCCB's involvement with the family and taking the child into custody directly after Mother gave birth. Father believes that visits with Mother and the child are usually very good and that the child has a strong bond to Mother, despite various testimony and reports indicating the opposite. Father's intention to allow Mother around the child, regardless of if she is sober, evidences the fact that Father does not have a full understanding of Mother's mental health and how this desire is not in the best interests of [J.C.S.]

The child is extremely attached to his foster family. The caseworker observed the child in the foster home, where he appears happy and comfortable. The child seeks foster mother out for affection, comfort and validation. The child regularly sits in foster mother's lap when providers are at the home and the child is often playing with his foster siblings. The child is particularly close to his foster sister, who[m] he often tries to

protect when service providers come to the foster home. Dr. Rosenblum witnessed the child assisting foster parents during the assessment and enjoying their company. Elaine Logan witnessed the child call the foster parents "Mommy" and "Daddy" at the age of 2 and 3 and he has continued to call the foster parents by those names. The child recognizes the foster home as his home and his safe place.

. . . Dr. Rosenblum observed [J.C.S.] to be strongly and securely attached to his foster parents, as they provided him with reliable security, love and affection. There was ample evidence to support the conclusion that the child is part of a cohesive family unit within the foster home and he identifies his foster parents as his family.

[J.C.S.] has grown up entirely in the foster home. He has never lived with Mother or Father. [He] has only had unsupervised visits with Father for a brief period of time . . . . The foster parents have attended to all of the child's needs since birth and he is securely attached to the foster parents. The child has an emotional connection to his foster parents and siblings. Removing the child from the foster home after he has remained there for his entire life would be detrimental to his development and emotional wellbeing.

Orphans' Court Opinion, 4/10/23, at 75-77 (cleaned up).

Thus, in conducting the bond-effect analysis, the orphans' court determined that the specific circumstances of this case favored termination. Upon review of the certified record, we wholly agree with the well-reasoned opinion of the orphans' court and discern no abuse of discretion in its determination that termination of Father's parental rights would not "cause extreme emotional consequences or significant, irreparable harm." *In the Interest of K.T.*, *supra* at 1109-10 (cleaned up).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

FILED: 1/30/2024